Hervey, J., delivered the opinion of the Court in which Keasler, Alcala, Richardson, Newell, and Walker, JJ., joined.
Applicant, Steven Mark Chaney, was convicted of murder and was sentenced to life imprisonment and fined $5,000. His conviction was affirmed on appeal. Chaney v. State , 775 S.W.2d 722 (Tex. App.-Dallas 1989, pet. ref'd). He now claims that he is entitled to relief because (1) new scientific evidence contradicts bitemark-comparison evidence relied on by the State at trial,[1] (2) his conviction was secured using false evidence,[2] (3) the State violated Brady ,[3] and (4) he is actually innocent.[4] The State and habeas court agree that Chaney is entitled to relief on all grounds. After reviewing the record, we agree and relief is granted.
I. BACKGROUND[5]
On June 20, 1987, Rhea "Jack" Rasnic and his girlfriend, Nicole Strange, found the bodies of John and Sally Sweek in their apartment. Their throats were slashed, and they had been stabbed multiple times. Police also found what they believed to be a human bitemark on John's left forearm. There were no eyewitnesses to the offense.
a. Discovery of the Bodies
The day of the murders, Rasnic and John were supposed to go fishing, but they never went because Rasnic was unable to reach John. Throughout the day, Rasnic called John's apartment phone almost a dozen times, and he stopped by his apartment a few times, but no one answered the door when he knocked. Because they had plans, he thought it was odd that John had not gotten in touch with him, but he decided that he and Nicole would try to meet up with John and Sally that evening at a pool party at the Sweek's apartment complex. However, John and Sally never showed up at the party. Rasnic and Nicole walked over to John and Sally's apartment and knocked on the door, but again no one answered. The pair went back to the party for a while, then returned to the apartment between 9:00 p.m. and 9:30 p.m. Rasnic and Nicole looked through one of the windows and saw two bodies lying on top of each other on the floor. After discovering the bodies, they went home,[6] and *245 Nicole called her brother Gary Strange, John's best friend. Gary called John's father, Henry Sweek, and one of John's brothers, Rick Sweek. Afterward, Rasnic, Nicole, and Gary went to John and Sally's apartment to meet Rick. Between 10:30 p.m. and 11:00 p.m., Rasnic, Gary, and Rick walked to the apartment window together and looked in. Rick fell to his knees and started crying. After Rasnic and Gary comforted him, Rick called his father, and Rasnic went back to the pool and called the police from a pay phone.
b. The Crime Scene
When Officer Robert Hinton arrived at the scene, he entered the apartment and found the bodies of John and Sally in the kitchen lying in a pool of blood. He also noticed shoeprints made of dried blood on the carpet. Investigator James Vineyard and his supervisor from the Dallas Police Department Physical Evidence Section processed the crime scene, which included photographing, collecting evidence, and searching for fingerprints. They noticed some bloodstains in the foyer that Hinton had not seen. The shoeprints began on the linoleum in the kitchen and went into the carpeted dining room and through the living room to the front door. Vineyard thought that the prints had been made within the last day. He also thought that they could have been made by two different shoes because some prints appeared to have been made by a flat-heeled shoe, while others had a gap between the sole and the heel.[7] One of the bloody shoeprints in the kitchen appeared to show a pattern of parallel lines from a design on the sole of the shoe. After photographing the shoeprints, Vineyard removed portions of the carpet to preserve some of the prints.
In the kitchen, Vineyard found the bloodied bodies of John and Sally.[8] He saw a large amount of both dried and wet blood on the bodies and on the kitchen floor. He also saw blood spatter on the kitchen counter, the refrigerator, the stove, and the *246 dishwasher. Some of the spatter was between three and three-and-a-half feet across. He also found blood smears and spatter on the wall dividing the dining room from the kitchen. According to Vineyard, "with the amount of blood that was present in the kitchen area, any individual that walked away from there probably had a large quantity of blood on his shoes, his pant-leg area, maybe even higher than that."
After documenting the crime scene, Vineyard began collecting evidence, including dusting the apartment for fingerprints. He and his supervisor processed the inside and outside of the front door, portions of the foyer wall, areas around the dining room and kitchen, window sills, the entrance way to the kitchen, countertops, appliances, and some countertop items. They found no fingerprints outside of the apartment, but inside they found between three and four dozen. Some of them were bloody or near blood. Of the dozens found, only one partial fingerprint was identified as Chaney's: a partial left-thumb print found on the small wall abutting the entrance to the kitchen. It was not bloody. The print was two-and-a-half to three feet above the floor pointing up and was a few feet from John's body. Vineyard thought that the print could have been left by someone who had been crouching down over someone and grabbed the wall (the State's theory), but he also thought that it could have been left by someone who walked past the wall and touched it, or even by a person leaning down to pet John and Sally's small dog (the defense theory), which was found alive in the apartment under the bed.[9]
c. The Investigation
Homicide Investigator John Westphalen arrived on scene shortly after Vineyard and Vineyard's supervisor. He walked through the apartment and spoke to people who had been gathering in the parking lot outside, including some Sweek family members. No one that Westphalen spoke to saw or heard anything. A few hours later, Westphalen spoke to members of the Sweek family again and learned that John and Sally were involved in selling drugs and that a man named Juan Gonzalez, who supplied drugs to John, might be a person of interest.[10] About a week after the murders, one of Sally's sisters, Mary Sweek, gave Westphalen a spiral notebook that she found in the apartment after the police left. The notebook appeared to be a drug ledger, and it had names, weights, and the amount of money people owed John. Chaney's name was in the notebook with some others, including members of the Sweek family.
A few days later, Westphalen received an anonymous call suggesting that Chaney might be a person of interest.[11] The caller told Westphalen that he and Chaney bought cocaine at the Sweek apartment three to four times a week for months before the murders and that they went to *247 the apartment a week before the murders. He also told Westphalen that Chaney owed John money when he was killed and where Chaney worked in case he wanted to talk to him.[12]
Based on the phone call and the fact that police found a partial thumb print from Chaney's left thumb, Westphalen and his partners visited Chaney at his construction job. When Westphalen approached Chaney and identified himself, Chaney immediately asked Westphalen if his visit was about the murders. Westphalen responded that it was, and Chaney told him that he had "eight witnesses who knew where he was on the night of the 20th and he had not been in that apartment in three weeks." Westphalen arrested Chaney for two outstanding tickets, took him back to the police station, and interviewed him before releasing him.
When Westphalen questioned Chaney again on July 20, he noticed that Chaney was wearing tennis shoes that, in his opinion, resembled some of the bloody shoeprints on the apartment floor. Westphalen seized Chaney's shoes and arrested him on suspicion of capital murder.
II. PROCEDURAL HISTORY
a. The Mistrial
On October 28, 1987, the trial court held a pretrial hearing about the admissibility of oral statements made to Westphalen and Hilton (the anonymous caller) by Chaney; the extent to which the defense could introduce evidence about Gonzalez, a drug supplier for John (and an alternate suspect according to the defense); and extraneous offenses committed by Chaney. Westphalen testified first. During his testimony, it became clear that he had notes and other evidence that were not disclosed to the defense in violation of the parties' agreed discovery order. At the end of the testimony, the trial judge adjourned the hearing, so he could examine Westphalen's file for other exculpatory evidence. The following morning, the judge held an in-chambers meeting with the attorneys and told them that he found "several things" that he thought might be exculpatory, including evidence regarding Gonzalez, an alternative suspect. The defense was granted a two week continuance.
When the pretrial proceedings resumed on November 16, Hilton testified about the statements Chaney made to him and Chaney's extraneous offenses. He said that Chaney asked him to re-pay the money he owed Chaney because Chaney needed to buy a car, and he needed to send child support to Houston. He also told him that he might leave town. The defense objected to the admission of the oral statements because they had not been disclosed by the State. The judge ruled that the statements and extraneous offense evidence were admissible.
After the ruling, the jury was brought back in and the trial began. The State called Hilton as its first witness. On cross-examination, Hilton testified that Chaney told him that he "cleared up [his debt] with John." The defense objected because that *248 statement had never been disclosed by the State or raised during the pretrial hearing. The court sustained the objection.[13] The jury was excused, and the judge asked the State whether there were any other statements that would come out that the court and the defense had not heard about. Defense counsel asked for an instruction to disregard and moved for a mistrial because of bad faith on the part of the State.[14] The judge granted the request for a mistrial after the jury returned.[15]
b. Second Trial
The State reindicted Chaney, and the defense filed a plea in bar. The judge denied the motion, and Chaney's second trial commenced later that day. At his second trial, the State tried Chaney only for the murder of John. The jury convicted him, sentenced him to life imprisonment, and fined him $5,000. The Dallas Court of Appeals affirmed his conviction. Chaney , 775 S.W.2d at 722.
III. EVIDENCE
a. State's Case
The State's case was mostly circumstantial. According to the State, Chaney might have left some of the shoeprints in the *249 apartment because some of the prints were consistent with tennis shoes, and Chaney was wearing tennis shoes when Westphalen first interrogated him. It also argued that subsequent presumptive blood testing of the shoes revealed non-visible traces of an unknown substance that might have been blood. According to the forensic serologist, Carolyn Van Winkle, presumptive blood tests can return false positives, but in her experience, the substance is more likely to be blood when there is a quick positive result, as happened in this case. She also said, however, that she could not say if the substance was blood because there was so little material to test and that, even if it was, she did not know whether the blood was from a human or another animal. The State also relied on a partial thumb print found on a wall abutting the kitchen entrance to place Chaney at the scene. It further argued that, given the location and orientation of the partial thumb print, Chaney might have been bending over something, like John's body, which was a few feet away, when he left that print.
In addition to the tennis shoes and partial thumbprint, the State relied on the statements that Chaney made to Westphalen and Hilton. According to the State, Chaney's statements to Westphalen showed consciousness of guilt in that Chaney was overly interested in the murders, and he immediately tried to convince Westphalen that he had nothing to do with the murders even though Westphalen had not yet told Chaney why he was looking for him. The State also used Hilton's testimony to show Chaney's motive for murdering John, which was that Chaney owed John money and that Chaney wanted more cocaine badly enough that he was willing to kill John to get it. Hilton testified that he had overheard John and Chaney talking about money that Chaney owed John and that Chaney needed to "clear his debt." The next day, Hilton went to John's apartment by himself to get more cocaine,[16] and John mentioned to him that he needed the money Chaney owed him. Hilton saw $500 written on a piece of paper and assumed that was how much Chaney owed John. The following week, according to Hilton, he spoke to Chaney and again asked him if he had "cleared his debt with John," to which Chaney replied that he had. Chaney also asked Hilton for the money that Hilton owed him again because he needed to pay for a car that he bought,[17] he needed to pay child support, and he needed to go to Houston to see his wife and kids. Chaney told Hilton that he was his "alibi"[18] because the last time he was at the apartment was with Hilton. This conversation took place almost two weeks after the murders.
Based on their conversations, Hilton testified that he was concerned that Chaney *250 might have been involved in the murders because "[t]here was a conflict in the story [Chaney] told me on whether he had cleared his debt or not and the last time that he had been over there, and it scared me." Hilton anonymously called Westphalen because of his concerns and told him that he and Chaney had been at the Sweek apartment the week prior to the murders and that, when they went, Chaney bought cocaine from John, and he bought cocaine from Chaney. He also told Westphalen that he and Chaney owed John money when John was killed and where he could find Chaney.[19]
Hilton further testified that, after the phone call, and after Westphalen and his partners visited Chaney, Chaney showed up at his house unannounced and told him that he had been picked up for questioning at work and could not "believe that this was happening to him, [and] that he didn't have a damn thing to do with it ...." According to Hilton, Chaney again reiterated that Hilton was his "alibi" and that he could not believe what was happening. He also asked Hilton about the money he owed him because he needed to make his child support and car payments, and he told him that he "needed to go to Houston to get out of town until this kind of blows over."[20] Hilton thought that Chaney was talking about the murders. Before Chaney left, Hilton again asked Chaney if he had paid John, and Chaney responded again that he had. During their third and final conversation a few weeks later, Chaney told Hilton that their fingerprints had been found "all over the apartment." He also reiterated that Hilton was his alibi and asked for the money Hilton owed him. Hilton told Chaney that he was never going to pay him and that they should not talk to each other anymore.[21]
The final piece of the State's case was testimony from two forensic odontologists that a mark found on John's left forearm was a human bitemark made by Chaney at the time of the murders. One of the witnesses, Doctor James Hales said that there was only a "[o]ne to a million" chance that someone other than Chaney bit John because the mark was a "perfect match" with "no discrepancies" and "no inconsistencies." He claimed that the "one to a million" statistic was found in "the literature."[22] He also testified that the injury *251 was inflicted at the time of the murders. Hales's testimony was damning, placing Chaney at the scene of the crime when John and Sally were murdered. The other witness, Doctor Homer Campbell, testified that the mark was actually at least four separate human bitemarks and that, after comparing dentition models[23] and examining photographs, he was certain to a "reasonable degree of dental certainty" that Chaney was the one who bit John. The bitemark evidence was the State's strongest evidence according to its own closing arguments.
b. Defense Case
1. The Alibi
Chaney claimed that he had an alibi. He also sought to create reasonable doubt by impeaching the State's theory of the crime. According to Chaney's alibi witnesses, he lived in Millsap on property owned by his girlfriend's father, John Hooper, Sr. According to Hooper, Chaney left the property the day of the murders[24] at about 5:15 a.m. Hooper's wife, Dora Hooper, saw Chaney leave between 5:00 a.m. to 5:30 a.m., and Barry Hines, Chaney's girlfriend's son from a prior marriage, testified that Chaney had already left for work when he woke up around 6:00 a.m.
According to the foreman at the construction site and another one of Chaney's colleagues, both of whom did not socialize with Chaney, Chaney worked the day of the murders, arriving just before 7:00 a.m., and he left around 9:00 a.m. after it began to rain. Hooper Sr. remembered Chaney returning to the property at about 9:30 a.m., Dora thought that Chaney returned between 9:30 a.m. and 10:00 a.m. Lenora "Lindy" Murley, Chaney's girlfriend, testified that she knew that Chaney was home at 9:30 a.m. because that is when he woke her up and told her that he was going to do some work around the property. Hines said that Chaney returned home around 9:00 a.m.
After Chaney returned, he helped Hooper Sr. hang some sheetrock in Hooper's kitchen and then worked on Dora's car until the middle of the afternoon when he received a phone call at about 2:30 p.m. After the phone call, Chaney told Hooper Sr. that he needed to pick up some furniture. Murley's sister, Janey Hunter,[25] was moving into a new house and needed to empty her trailer, which included Chaney and Murley's furniture. Murley testified that she borrowed her parents' rusty[26] 1976 Chevy pickup and some gas money, then she left with Chaney and her son at about 5:00 p.m. to pick up the furniture. Hooper Sr. remembered them leaving between 4:00 p.m. and 5:00 p.m.
While driving to Hunter's trailer in Cedar Creek (about a four-hour drive from Millsap), one of the truck's tires blew out in Fort Worth. Murley and Chaney needed *252 a ride to get another tire because theirs could not be fixed, and the only nearby tire shop was closed, so Murley tried to call her sister Nina,[27] who lived in Fort Worth. Nina was not home, but two of her friends were house sitting, and they answered the phone-Rebecca "Becky" Edwards and her husband Keith Edwards.[28] They offered to help Murley and drove out to meet them. Chaney and Keith removed the blown-out tire and went to get a replacement. Murley testified that they came back between an hour and an hour-and-a-half later. After replacing the tire, Murley, Chaney, and Hines left the gas station around 7:30 p.m. or 8:00 p.m. and arrived at the trailer at about 9:30 p.m. They found a note from Hunter at the trailer with directions to her new house. Because it was dark outside, they decided to move the furniture the next day and drove to her house to spend the night. Hunter remembered that they arrived at about 10:30 p.m. According to Hunter and Hines, Hines watched cartoons for a while, and the other three talked for a bit, before everyone went to bed between 11:00 p.m. and 11:30 p.m.
2. Other Evidence
The defense called Charles Currier, a Footlocker manager, to lessen the impact of the State's argument that a pattern in some of the bloody shoeprints could have been left by one of Chaney's tennis shoes when he committed the murders. He testified that he had been selling shoes for 23 years and that the pattern that the police thought might have been reflected in the shoeprint was "probably the most widely used sole in athletic footwear." He also said that for 15 years, 50% to 80% of all athletics shoes used that sole pattern. The defense also pointed out that even the police's own expert reached inconclusive results after comparing Chaney's tennis shoes to the bloody shoeprints.
The defense called two witnesses to testify about the mark on John's left forearm. The first expert, Linda Norton, testified that the mark was a human bitemark but that it was "virtually unsuitable for making a good dental comparison ...." because "almost anyone who has relatively even top and bottom teeth is going to be capable of leaving this bite mark." According to her, she would not have submitted the mark for comparison. Chaney's second witness, Doctor John McDowell, a forensic odontologist, agreed with the State's experts that the mark on John's left forearm was a human bitemark, and he agreed that the photographs from Weiner's office were of good quality, but his comparisons were nonetheless inconclusive.
c. Closing Arguments & Verdict
1. The State-First Closing
The State argued, relying on only Hilton, that Chaney killed the Sweeks because he owed John money for cocaine John had fronted him and because he was addicted to cocaine and was willing to do anything to get more. The State also urged the jury to rely on Chaney's statements to Westphalen and his statements to Hilton, as well as its blood and fingerprint evidence, and it attacked Chaney's alibi, pointing out that almost all of the witnesses were his girlfriend's family members *253 and that even they could not agree when Chaney returned home the morning before the murders. The State also cited testimony from the foreman at the construction site and Chaney's colleague, both of whom testified that Chaney was in Irving at the Las Colinas construction site at 9:00 a.m.
2. The Defense
According to the defense, Chaney went to work the day of the murders, and after the crew was "rained out," he went home. He spent the rest of the day hanging sheetrock and working on cars before spending the night at Hunter's and picking up some furniture the next morning. The defense conceded that its witnesses did not agree about exactly when Chaney left the day of the murders or when he returned home, but it asserted that it would be unusual if the witnesses had all testified to identical times. It also pointed out that, despite those small discrepancies, all the witnesses' testimony placed Chaney in a different county-Parker County-at the time of the murders.
The defense argued that Hilton was not credible because he admitted to lying to people and that Hilton had reason to implicate Chaney because he owed John and Chaney money at the time of the murders, and it pointed out that Hilton had been convicted of many felonies-so many that he could not remember them all-and that the State had given him immunity for his testimony against Chaney. It also claimed that the evidence showed that the pattern on the sole of the shoe in the bloody shoeprints did not appear to be the same as the pattern on the sole of Chaney's tennis shoes and that the pattern was one of the world's most common shoe-sole patterns. The defense argued that the presumptive blood test was not probative because Van Winkle did not even know if the spots were actually blood, much less if they were of human or animal origin. To impeach the State's fingerprint evidence, the defense explained that, even though a partial left thumbprint from Chaney was found, he went over to the apartment often, so finding a print was not unexpected. It also cited Vineyard's testimony that the fingerprint could have been left well before the murders and asserted that, even though the State's evidence showed that the assailant would have been covered in blood, the partial thumbprint was not bloody or near blood. The defense forcefully argued that Gonzalez was a "prime suspect" that authorities did not meaningfully investigate.[29]
The rest of the defense's closing argument focused on discrediting the State's bitemark evidence. The defense argued that the bitemark should have been better preserved and that better equipment should have been used to examine the mark. It also asserted that bitemark comparisons are merely "interpretative," pointing to the conflicting testimony about whether the injury was even a bitemark.
3. The State-Second Closing
The State spent almost all its second summation discussing the bitemark evidence. The prosecutor emphasized Hales's testimony that "only one in a million could have possibly made that bite mark" before asking the jury "[w]hat more do you need?" He then cited Campbell's testimony that he was sure, to a "reasonable degree of dental certainty," that Chaney bit John.
*254 The State also tried to discredit Norton, one of the defense experts, as a charlatan somewhere between "Quincy and Matt Dillon" and painted McDowell's testimony, the other defense expert, as helpful to the State even though he testified that his comparisons were inconclusive. The prosecutor concluded by arguing that the bitemark evidence was "better than eyewitness testimony. [Eyewitnesses] can make mistakes, as [defense counsel] said" and that,
But, most of all, we have the bite mark. I wouldn't ask you to convict just based on the testimony of the tennis shoes, of the statements Chaney made to Westphalen, or the statements he made to Curtis Hilton. But, by golly, I'm going to ask you to convict on that dental testimony.
IV. COURT OF APPEALS
Chaney appealed his murder conviction to the Dallas Court of Appeals. Chaney , 775 S.W.2d at 722. He argued that the evidence was legally insufficient and that the trial court erroneously admitted hearsay, Chaney's oral statements to Westphalen and Hilton, and testimony about extraneous offenses. Id. at 723. The court of appeals overruled his points of error and affirmed his conviction. Id. This Court later refused Chaney's petition for discretionary review.
V. PROCEDURAL HISTORY OF WRIT PROCEEDINGS
After Chaney was convicted, he filed an application for post-conviction habeas corpus relief, claiming that he is entitled to relief on four grounds: (1) new scientific evidence contradicts bitemark-comparison evidence relied on by the State at trial, (2) his conviction was secured by the use of false evidence, (3) the State violated Brady , and (4) he is actually innocent.
The parties recommended that this Court grant relief on Chaney's false-evidence and new-science claims, and the trial court adopted that agreement. Instead of following that recommendation, however, we remanded the cause to determine whether Chaney intended to abandon his Brady and actual innocence claims.[30] On remand, Chaney filed an amended memorandum of law, and the parties agreed that Chaney was entitled to relief on those claims as well. The habeas court adopted the parties' agreement in its agreed supplemental findings of facts and conclusions of law.
VI. ARTICLE 11.073
According to Chaney, "while much of th[e] [trial] testimony appeared to be in accord with the state of scientific knowledge in 1987 about what could and could not be concluded from a bite mark, in the intervening decades since [his] conviction, the ground on which Drs. Hales and Campbell based their assertions [about bitemark comparisons] has given way entirely." He contends that the "[s]cientific understanding about whether it is possible to 'match' a particular person to a bite mark in skin and whether random match probabilities can be given for a bite mark has now reversed course." He also argues that he is entitled to relief because Hales has changed his trial opinion that the bitemark was inflicted at the time of John's death, which was an opinion upon which the State heavily relied. Hales now believes *255 that the wound was two to three days old when John and Sally were killed.
a. The Law
In 2013, the legislature enacted Article 11.073 of the Texas Code of Criminal Procedure, which allows a defendant to obtain post-conviction relief based on a change in science relied on by the State at trial. TEX. CODE CRIM. PROC. art. 11.073. That statute provides that an applicant is entitled to post-conviction writ relief if he can prove that:
(1) Relevant scientific evidence is currently available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial;
(2) The scientific evidence would be admissible under the Texas Rules of Evidence at a trial held on the date of the application; and
(3) The court must make findings of the foregoing and also find that, had the scientific evidence been presented at trial, on the preponderance of the evidence the person would not have been convicted.
Id. art. 11.073(b)(1) & (2). When assessing reasonable diligence, courts consider whether "the field of science, a testifying expert's scientific knowledge, or a scientific method on which the relevant scientific evidence is based" has changed since the applicant's trial. Id. art. 11.073(d). "Scientific method is defined as '[t]he process of generating hypotheses and testing them through experimentation, publication, and republication.' " Ex parte Robbins , 478 S.W.3d 678, 691 (Tex. Crim. App. 2014). "Scientific knowledge" includes a change in the body of science (e.g., the field has been discredited or evolved) and when an expert's opinion changes due to a change in their scientific knowledge (e.g., an expert who, upon further study and acquisition of additional scientific knowledge, would have given a different opinion at trial).[31] TEX. CODE CRIM. PROC. art. 11.073(d) ; Robbins , 478 S.W.3d at 691.
b. Relevant Findings of Fact and Conclusions of Law
In its agreed findings of facts and conclusions of law, the habeas court found that:[32]
• [T]he science behind forensic odontology as it relates to bite mark comparisons has considerably evolved since the time of trial in 1987. The Court further finds that these new scientific advancements contradict the scientific evidence relied on by the State at trial.
* * *
• The Court finds that no scientific evidence has been produced to support the basis of individualization of a bite mark to the exclusion of all *256 other potential sources in an open population. The Court also takes judicial notice of the reference manual published by the American Board of Forensic Odontology (ABFO), which sets out the guidelines to be followed by ABFO Diplomate forensic odontologists.[33 ]
• The Court finds that the [March 2015] Manual prohibits ABFO Diplomates from testifying to individualization of bite marks in an open population, i.e., where the universe of potential suspects, or "biters," is unknown. The Court also finds that the ABFO's guidelines at the time of [Chaney]'s trial did not prohibit this testimony.
* * *
• The Court finds that the terms ["]match["] and ["]biter["] as it related to suspected sources of bite marks was permissible terminology under the ABFO guidelines and scientific field of forensic odontology at the time of trial.
* * *
• The Court, therefore, finds that Dr. Hales's use of the terms ["]match["] and ["]biter["] as it related to [Chaney] was appropriate under the ABFO guidelines and scientific field of forensic odontology at the time of trial.
• The Court also finds Dr. Hales's and Dr. Homer Campbell's testimony that it was their opinion, to a reasonable degree of dental certainty, that [Chaney] made the bite mark on John Sweek's arm was appropriate under the ABFO guidelines and scientific field of forensic odontology at that time.
• However, the Court finds that such testimony would not be justified, admissible, or accurate under today's guidelines because the scientific community and the ABFO guidelines have invalidated individualization of bite marks in an open population, as we have in this case.
* * *
• The Court finds that the changes in science and the evolution of the field of forensic odontology as it relates to bite mark comparisons constitutes relevant scientific evidence that was not available to be offered by [Chaney] at the time of trial in 1987.
• As such, the Court finds that the current relevant scientific evidence related to bite marks was not available at the time of [Chaney]'s trial because the evidence was not ascertainable through the exercise of reasonable diligence by [Chaney] before the date of or during trial.
* * *
• The Court finds that the current scientific evidence related to bite marks would be admissible under the Texas Rules of Evidence at a trial held on the date of the pending habeas application. See Coronado , 384 S.W.3d at 926-28.
• The Court finds that had the bite mark evidence been presented at trial under current scientific standards, on the preponderance of the evidence [Chaney] would not have been convicted. In so finding, the Court notes that bite mark evidence was central to the State's case -- so much *257 so that -- the State even argued to the jury at trial that it should convict mostly on the bite mark evidence. (RR8: 801-02). The State further emphasized the bite mark evidence by reminding the jury that Dr. Hales testified that only one in a million people could have possibly made the bite mark, asking rhetorically, "What more do you need?" The impact of this evidence on the jury is further evidenced by a juror's testimony in [Chaney]'s Motion for New Trial hearing that she [voted to convict] based on the bite mark. (RR9: 6).
• The Court finds that [Chaney] has satisfied his burden of proof by preponderance of the evidence, meriting relief under Ground One.
In its supplemental agreed findings of fact and conclusions of law, the habeas court additionally found that:
• The Court finds that the [ABFO] Manual was updated again in [March 2016]. The current Manual prohibits individualization testimony entirely, regardless of whether the population at issue is open or closed. Under the current Manual, the only permissible conclusions for ABFO Diplomates are: "Excluded as Having Made the Bitemark"; "Not Excluded as Having Made the Bitemark"; or "Inconclusive."
• The Court finds that this change further supports [Chaney]'s claim under Article 11.073, as neither Dr. Hales's nor Dr. Campbell's testimony could be proffered under these even more restrictive Guidelines.
The record reasonably supports the findings of the habeas court, so we adopt those findings. For the reasons that follow, we conclude that Chaney is entitled to relief under Article 11.073 on the grounds that, not only has the body of scientific knowledge underlying the field of bitemark comparisons evolved in a way that discredits almost all the probabilistic bitemark evidence at trial, but also because Hales's new opinion that the bitemark was inflicted days before the murders based on his new scientific knowledge that was not available at Chaney's trial. Robbins , 478 S.W.3d at 692.
c. Change in the Field of Scientific Knowledge
To support his "change in the body of the science" arguments, Chaney cites (1) excerpts from the 2009 National Academy of Science: "Strengthening Forensic Science in the United States: A Path Forward" (NAS Report),[34] (2) an affidavit from Drs. Mary Bush, DDS, and Peter Bush; (3) an affidavit from Hales, who testified at trial; (4) a supplemental affidavit from Hales; (5) an odontology report written by Dr. Alastair Pretty; (6) a supplemental odontology report written by Pretty; (7) an affidavit from Pretty, (8) an affidavit from Drs. Cynthia Brzozowski, James Wood, and Anthony Cardoza (Brzozowski et al.); (9) a supplemental affidavit from Brzozowski, et al.; (10) an affidavit of Dr. Michael Baden, M.D.; and (11) an amicus curiae brief filed in the California Supreme Court, which was authored by 38 "scientists, statisticians, and law-and-science scholars and practitioners."[35]
*258 In response to Chaney's writ application, the State "acknowledges and concedes that the science behind forensic odontology, as it relates to bite mark comparison, has considerably evolved since the time of trial in 1987" and that "[u]nder today's scientific standards, Dr. Hales relayed that he 'would not, and could not' testify as he did at trial, nor could he testify that there was a 'one to a million' chance that anyone other than [Chaney] was the source of the bite mark." The State succinctly summarizes its position, when it states that "the bitemark evidence, which once appeared proof positive of ... Chaney's guilt, no longer proves anything."[36]
The dual principles underlying Hales's and Campbell's opinions were that a human dentition, like a fingerprint, is unique and that human skin is a medium capable of recording a person's biting surface with sufficient fidelity that a particular individual can be identified as the source of a particular bitemark. If either of those premises are invalid, then the comparisons by Hales and Campbell claiming that Chaney was a "match" have no probative value because they are based on principles now known to be unsupported by science. According to Chaney (and his experts), although those two assumptions were accepted by the scientific community at the time of Chaney's trial, that community now rejects them.[37] He argues that experts in the field have developed a new body of science, mainly in response to the NAS Report. That report also asserted that those principles were unproven and unreliable. That report concluded that:
(1) The uniqueness of the human dentition has not been scientifically established.
(2) The ability of the dentition, if unique, to transfer a unique pattern to human skin and the ability of the *259 skin to maintain that uniqueness has not been scientifically established.
i. The ability to analyze and interpret the scope of extent of distortion of bite mark patterns on human skin has not been demonstrated.
ii. The effect of distortion of different comparison techniques is not fully understood and therefore had not been quantified.
(3) A standard for the type, quality, and number of individual characteristics required to indicate that a bite mark has reached a threshold evidentiary value has not been established.
NAS Report at 175-76. It also stated that "bite marks on the skin will change over time and can be distorted by the elasticity of the skin, the unevenness of the surface bite, and swelling and healing. These features may severely limit the validity of forensic odontology." Id. at 174.
Peer-reviewed studies conducted after the publication of the 2009 NAS Report, Chaney asserts, now show that the uniqueness of human dentition can never be established within measurement error, and even if a person's dentition was unique, the skin cannot faithfully preserve that uniqueness such that a particular dentition can be associated with a particular putative bitemark. See Bush Affidavit at 4; Pretty Supp. Report at 2. Chaney also relies on the amicus brief's conclusion to the same effect, Amicus Brief at 34-40, and he directs us to Hales's affidavits.
The Bushes undertook a number of peer-reviewed studies to test the assumptions underlying Hales's and Campbell's testimony. The first group of studies tried to replicate the Rawson Study's conclusion-the literature relied on by Hales and Campbell at trial-that each human dentition is unique. See Brzozowski et al. Affidavit at 9 (citing peer-reviewed studies from the Bushes). The Rawson Study "examined tooth positions within dentitions and concluded that the very large number of possible positions meant that the human dentition is unique 'beyond any reasonable doubt.' " Bush Affidavit at 5. However, that study was based on two unproven assumptions, according to the Bushes. The first was that there was "no correlation of tooth position (i.e., that the position of one tooth did not affect the position of any other)," and second was that "there was a uniform or equal distribution over all possible tooth positions (i.e., that tooth locations did not gather into common patterns)." Id. Using Rawson's methods, the Bushes plotted "landmark points on two sets of dentitions, resulting in x, y, and angle coordinates for each tooth." Id. at 6. They then looked for matches one, two, three, four, five, and six teeth at a time. Id. They ran two thousand simulated tests to verify their results and to determine whether the Rawson Study's results would remain accurate "if its assumptions about the lack of correlation and non-uniformity of dental arrangement were ignored." Id. Their results were contrary to those of the Rawson Study-the Bushes observed "significant correlations and non-uniform distributions of tooth positions in [their] data sets." Id. at 6. In other words, they found that the human dentition is not unique.
In a second series of peer-reviewed studies, the Bushes devised another way to test the unique-dentition theory. They studied "dental shape in large populations using geometric morphometric analysis and mathematical modeling methods common in other scientific disciplines." Id. at 7. They found that dental shape matches occurred in the populations that they studied, which was consistent with the results *260 of their earlier studies and indicated that the human dentition is not unique. Id. at 8.
The Bushes also tried to replicate the Rawson Study's conclusion that human skin can record the characteristics of a bitemark with sufficient resolution to trace the source of the bitemark to the "biter." The Bushes "began with a series of studies that used the same dentition impressed into cadavers to explore how skin might distort any marks." Id. at 7-8. For example, they "examined how anisotropy might create distortion by examining bitemarks made both parallel and perpendicular to skin's tension lines (also known as Langer lines)." Id. at 6. They also looked at the effect of tissue movement and found that "the same dentition did not produce identical marks across these conditions." Id. They found that some marks made by the same dentition were "dramatically distorted from others," and that "bitemarks created by the same dentition on the same individual appeared substantially different depending on the angle and movement of the body and whether the mark was made parallel or perpendicular to tension or Langer lines." Id. at 8. A number of experts (and the NAS Report) agree that the human dentition is not unique and that, even if it was, skin is an inadequate medium to "match" a bitemark to a "biter." NAS Report at 175-76; Amicus Brief at 27-28, 35-38; Pretty Report at 6; Pretty Supp. Report at 2; Brzozowski et al. at 9
In addition to those studies, Chaney also directs us to Hales's affidavits about his own testimony and the evolving standards of the ABFO. In his first affidavit, Hales explains that his testimony about "biters" and "matches" was acceptable at the time of trial under ABFO guidelines; however, the scientific body of knowledge about bitemark comparisons has changed since trial and that, under current guidelines, he would not, and could not, give the same opinions that he did at Chaney's 1987 trial.[38] The habeas court reached the same conclusion, noting that the 2016 ABFO Manual has completely invalidated any population statistics, regardless of whether the population is open or closed, and that the Manual no longer allows examiners to give opinions to a "reasonable degree of dental certainty."[39] See also Pretty Affidavit (noting that the ABFO revised its standards to address concerns in the NAS Report); Brzozowski et al. Affidavit at 5 (citing the NAS Report and exonerations based at least in part on the basis of bitemark evidence).
Based on the foregoing, we agree with Chaney. The body of scientific knowledge underlying the field of bitemark comparisons has evolved since his trial in a way that contradicts the scientific evidence relied on by the State at trial. New peer-reviewed studies discredit nearly all the testimony given by Hales and Campbell about the mark on John's left forearm and Chaney being a "match."[40] The revised *261 ABFO standards and affidavits attached to Chaney's writ application support that conclusion.
The next question is whether the new evidence Chaney has presented us with would have been admissible when he filed the instant writ application in 2015. We agree with the parties and the habeas court that it would have been admissible. No one has suggested that bitemark comparisons have no basis in science or that the authors of the affidavits are not qualified experts in that area. See TEX. R. EVID. 702. Rather, the ABFO and other experts have decided that the testimony of the sort given at Chaney's trial is now known to be scientifically unsupportable because it "went too far." As of March 2016, the ABFO has stated that the science supports only three conclusions: (1) excluded as having made the bitemark, (2) not excluded as having made the bitemark, and (3) inconclusive.[41] AMERICAN BD. OF FORENSIC ODONTOLOGY, INC., DIPLOMATES REFERENCE MANUAL: SECTION III: STANDARDS & GUIDELINES at 102 (March 2016). It has completely disavowed individualization (i.e., that Chaney was a "match"), which the State heavily relied upon at Chaney's trial.
d. Change in Hales's Scientific Knowledge Since Trial[42]
Chaney also claims that he is entitled to relief on the bases that Hales now says that he could not testify to any probability statistics that Chaney was the source of the mark considering new ABFO scientific standards and that Hales's scientific knowledge about the age of the wound has changed. We need not further discuss Hales's population testimony because we have already concluded that testimony is no longer supported by the body of science.[43] Because we conclude that Chaney is entitled to relief based on Hales's false wound-aging testimony, as we explain later, we do not address his Article 11.073 claim that he is entitled to relief because Hales's knowledge about wound aging has changed since trial.
e. Has Chaney Shown by a Preponderance of the Evidence That He Would Not Have Been Convicted?
The last question is whether Chaney has shown by a preponderance of the *262 evidence that, had the new scientific knowledge been presented at his trial, he would not have been convicted. We conclude that he has. The linchpin of the State's case was the bitemark evidence. It relied on the testimony of Weiner and Hales to show that the putative bitemark was inflicted at the time of the murders, and the testimony of Campbell and Hales to prove that Chaney was the one that bit John. Together that evidence was damning. Hales testified that Chaney was a "perfect match" and that there was only a "one to a million" chance that someone other than Chaney was the source of the mark. Campbell testified that he was certain to a "reasonable degree of dental certainty" that Chaney was the "biter." In its final summation, the State emphasized Campbell and Hales's testimony, particularly relying on Hales's "one to a million" testimony, leaving the jury to consider,
But, most of all, we have the bite mark. I wouldn't ask you to convict just based on the testimony of the tennis shoes, of the statements Chaney made to Westphalen, or the statements he made to Curtis Hilton. But, by golly, I'm going to ask you to convict on that dental testimony.
The State's case would have been incredibly weakened had Chaney's newly available scientific evidence been presented at his trial. Instead of supporting the conclusions that Chaney bit John at the time of the murders, the evidence would now show, at most, only that John might have been bitten two to three days before the murders[44] and that if John was bitten by someone,[45] that person could be Chaney (or anyone else on the planet whose dentition has not been excluded). The State's remaining evidence was circumstantial and weak. All that remained was a partial left thumbprint in an apartment Chaney frequented, statements Chaney made to *263 Westphalen about not being involved in the murders,[46] the changing statements of Hilton that resulted in a mistrial,[47] and a tennis shoe that might or might not have had some type of blood on it and that could have possibly left one set of the bloody shoeprints. The State even said during its closing that it would not have sought an indictment against Chaney without the bitemark evidence. The impact of the State's bitemark evidence is also evident by a juror's testimony at the new-trial hearing that "what did it for her" was the bitemark evidence.[48] We conclude that Chaney is entitled to relief because he has shown by a preponderance of the evidence that he would not have been found guilty if the newly available and relevant scientific evidence he now relies upon had been presented at his 1987 trial.
VII. FALSE EVIDENCE
In his next complaint, Chaney argues that Hales's testimony that there was only a "one to a million" chance that someone other than Chaney was the source of the injury was false according to the literature at the time. He also argues that Weiner's and Hales's testimony that the bitemark was inflicted at the time of the murders was false and misleading and that the described testimony was material to his conviction. The habeas court agreed with Chaney, and we adopt the findings of fact and conclusions of law of the habeas court because they are supported by the record.
Due process of law is violated when a conviction is obtained using false evidence, irrespective of whether the false evidence was knowingly or unknowingly used against the defendant. Ex parte Weinstein , 421 S.W.3d 656, 665 (Tex. Crim. App. 2014). A defendant is entitled to relief on a false-evidence claim if he proves that (1) the complained-of evidence was false and that (2) the false evidence was material to his conviction. Id. Whether evidence is false turns on whether the jury was left with a misleading or false impression after considering the evidence in its entirety. Id. at 665-66. The good or bad faith of the parties is irrelevant. Id. at 666. Falsity is a factual inquiry, and we review the court's findings under a deferential standard. Id. at 664. False evidence is material when "there is a 'reasonable likelihood' that [the false evidence] affected *264 the judgment of the jury." Id. at 665. Materiality is a legal question that we review de novo. Id. at 664.
Even though the scientific principles at the time of Chaney's trial supported some level of individualization (although those principles are no longer credible), Hales confesses that he knew at the time of trial that the body of science did not support his "one to a million" testimony.[49] Other record evidence supports Hales's assertions, including newly discovered notes from Hales's trial file, where he initially wrote that the odds were "thousands to one," with a nearby notation of "100,000 to 1," the Bushes's peer-reviewed studies disproving the tenets and conclusions of the Rawson Study dealing with population statistics, and the 2016 ABFO Manual forbidding the use of all population statistics.
With respect to the aging of the wound, Weiner's autopsy report, which was also signed by three other pathologists, described the wound on John's left forearm as "crusted and contused," and concluded that the injury was inflicted two to three days before the murders. Hales reached the same conclusion. He told Weiner that the wound was likely inflicted two to three days before death "because of crusting" and that, as a result, the person who bit John might not be the same person who killed him. But later, after he met with the prosecutor, Hales told Weiner that "the bite mark occurred at or about the time of death." He attributed the change in his opinion to the fact that he had confused crusting-i.e., evidence of healing-with serum drying.[50] The same day that Hales *265 told Weiner about his new opinion, Weiner alone signed a supplemental autopsy report showing that "the bite mark on [John]'s left forearm occurred at or about the time of death," and he sent the supplemental autopsy report to the prosecutor. While the original opinion that the wound was two to three days old hurt the State's case, the new opinion exactly conformed with the State's theory that Chaney was the murderer because he bit John and that he did so at the time that John was murdered.
At trial, Weiner testified that the wound was inflicted at, or near, the time of death, and Hales did not dispute that testimony.[51] Chaney and the State agree that Weiner's and Hales's testimony was false insofar as it misled the jury because Weiner and Hales did not disclose the purported scientific basis for the change in their opinion and because that basis was also not disclosed during their testimony. The habeas court agrees that the "failures deprived [Chaney] of the opportunity to appropriately challenge the testimony offered as to the injury's timing." "Accordingly, the Court finds that [ ]Weiner's testimony was false, both because it falsely suggested to the jury that the injury was inflicted at the time of death, and because the nondisclosure of the 'serum theory' was misleading to the jury."[52] The record supports the habeas court's findings; therefore, we adopt them.
The remaining question is whether the false testimony was material to Chaney's conviction. We agree with the habeas court that it was. As we have stated previously, the most important evidence was the State's bitemark evidence. Without it, the State's case would have been exceedingly feeble because the State could no longer place Chaney at the scene of the crime at the time of the murders. Consequently, we conclude that there is a reasonable likelihood that the false testimony affected the verdict of the jury. Chaney is entitled to relief.
VIII. Brady Allegations
Chaney also argues that newly discovered evidence shows that the State suppressed evidence favorable to him that was material to his conviction: (1) the State's failure to disclose that an earlier examination of Chaney's shoes by a different analyst uncovered no blood, or blood-like substance, in contrast to Van Winkle's testimony that her presumptive blood test was positive and that the substance was probably blood; (2) the fact that police *266 searched Chaney's home and vehicle to support its theory that Chaney was the killer and that the killer would have been covered in blood, but found nothing; and (3) the fact that Hilton gave numerous inconsistent statements to investigators and the court, which could have been used to significantly undermine his trial testimony. As with Chaney's other claims, the State agrees that Chaney is entitled to relief.
Under Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, the suppression of evidence favorable to an accused violates due process if the evidence is material to the accused's guilt or punishment. Id. at 87, 83 S.Ct. 1194. It is irrelevant whether the evidence was suppressed inadvertently or in bad faith, and the defense need not request disclosure because the State's duty to disclose is an affirmative one. United States v. Agurs , 427 U.S. 97, 112-13, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (request to disclose no longer required). For purposes of a Brady claim, "the State" includes the prosecution, other lawyers and employees in the prosecutor's office, and members of law enforcement connected to the investigation and prosecution of the case. Ex parte Miles , 359 S.W.3d 647, 665 (Tex. Crim. App. 2012) (citing Kyles v. Whitley , 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ). Favorable evidence includes exculpatory evidence and impeachment evidence. United States v. Bagley , 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Exculpatory evidence justifies, excuses, or clears a defendant from fault. Impeachment evidence disputes, disparages, denies, or contradicts other evidence. Harm v. State , 183 S.W.3d 403, 408 (Tex. Crim. App. 2006). The State may not suppress evidence incompatible with its own theory of the case or that supports the defense's case.[53] Suppressed evidence is material if there is a reasonable probability that the result of the trial would have been different if the suppressed evidence had been disclosed to the defense. Miles , 359 S.W.3d at 665. A reasonable probability is one sufficient to undermine confidence in the outcome of the trial. Ex parte Kimes , 872 S.W.2d 700, 703 (Tex. Crim. App. 1993) (citing Iness v. State , 606 S.W.2d 306, 310 (Tex. Crim. App. 1980) ). When assessing materiality, the suppressed evidence is considered collectively, not item-by-item. Kyles , 514 U.S. at 436, 115 S.Ct. 1555
On October 9, 2015,[54] the State sent Chaney's counsel a Brady notice, which we quote in its entirety,
During the post-conviction investigation of this cause, the District Attorney's Office agreed to make the complete DA file available to defense counsel for Chaney pursuant to an open file policy established in 2007. Prior to 2007, the DA's Office had a strictly "closed file" policy, in which defendants and their counsel were not allowed to view the contents of the Prosecutor's files. On occasion, individual *267 documents were provided to counsel if and when a prosecutor concluded disclosure was either required by the State's constitutional Brady obligations OR some other mandatory disclosure law.
After post-conviction discovery of the DA's file took place, the DA's Office obtained a copy of the Dallas Police Department's (DPD) investigative file regarding the homicides of John and Sally Sweek. During the discovery process, the DA's Office also obtained the file from the crime lab and the medical examiner's office. Interviews of the parties and witnesses have also been conducted.
Our investigation and review of the file as a whole, has revealed exculpatory and impeachment evidence, all of which should have been, but does not appear to have been, disclosed by [the trial prosecutor] ... to Chaney's defense counsel prior to or during the 1987 trials. As a result, this letter is meant to constitute a Brady Notice regarding the following evidence/information:
1. Undisclosed Evidence Pertaining to Alleged Bloody Tennis Shoes.
When Chaney was arrested a month after the crime, the lead detective on the case confiscated his tennis shoes. According to the investigative notes of the lead detective, the shoes were confiscated for two reasons. First, the soles of the tennis shoe[s] appeared to have the same pattern as the bloody shoe prints found at the crime scene. Second, the tennis shoes also had a substance on the bottom that looked like blood.
Chaney's case was presented to a Dallas County Grand Jury on August 10, 1987. During the presentment of the case, Detective Westphalen testified under oath that blood was found "on the bottom of the tennis shoes and a little bit on the tongue of the tennis shoes." The Grand Jury returned a true bill for the offense of Capital Murder.
During trial, the State presented testimony from Carolyn Van Winkle, an expert serologist at the crime lab (SWIFS). Van Winkle testified she conducted a presumptive test on the shoes and that the results of the test were positive for traces of blood but there was not enough blood to allow her to "even confirm the presence of blood." Despite being unable to confirm whether there was human blood on the tennis shoes, Van Winkle testified that the results of the presumptive test came up very rapidly and that based on her experience as a serologist, the test reacted the way traces of blood would react.
Although she stated during cross-examination and redirect that she could not say for sure the substance was human blood instead of some other substance that could cause a presumptive positive result, she discounted that opinion repeatedly by stating that in her experience, human blood reacts rapidly as it did in this case while other substances that test positive react much more slowly.
The DPD's investigative file contained significant undisclosed information regarding the absence of blood on the tennis shoes. Specifically, in investigative notes dated July 22, 1985 (1985 reference is clearly a mistake due to detailed repeated references to unique facts of Chaney case).
Detective Westphalen wrote:
"I also talked to Dr. Stone. Debbie Spencer [who] did the blood comparison on the spot on Chaney's tennis shoes. The spots are not blood."
According to [the trial prosecutor], this exculpatory evidence was not disclosed to the defense because [the prosecutor]
*268 never saw the evidence until it was recently shown to him during the post-conviction investigation in the case. If it had been disclosed, Chaney's trial counsel could have not only offered substantive evidence regarding the absence of blood, he could have impeached both Van Winkle's misleading testimony and Detective Westphalen for testifying inaccurately or untruthfully under oath during his grand jury testimony.
2. Undisclosed Evidence Pertaining to Search of Chaney's Property.
In June and July, 1987, Chaney lived in a trailer on a piece of property in [Millsap], Texas owned by his girlfriend's family. When questioned by law enforcement, Chaney maintained he was at home with his girlfriend and her family the day the murders were committed. When Chaney was arrested on July 20, 1987, he remained incarcerated in the Dallas County Jail until trial: Sometime after Chaney's arrest and before a pretrial hearing on October 19, 1987, [the prosecutor], his investigator Virgil Melton and Detective Westphalen went to the property where Chaney lived at the time of the murders. According to DA Investigator Melton, the purpose of the visit was to interview alibi witnesses and search Chaney's property for evidence of blood. Although no documentation regarding this visit has been found in either the DA file or the DPD file, DA Investigator Melton remembers arriving at the property and obtaining permission from a lady (whom he remembers as Chaney's mother) to search the trailer where Chaney lived with his girlfriend. He and the DPD investigator then conducted a search of Chaney's home unaccompanied by any resident or owner of the property. A stack of men's blue jeans believed to be Chaney's were located and searched for the presence of blood. Although DA Investigator Melton remembers seeing a black spot on a pair of blue jeans, he remembers making a joint decision not to seize any of the clothing because they concluded there was no blood present on the clothing.
On October 19, 1987, the trial court held a pre-trial hearing on motions filed by the defense. Shortly after the case was called, trial counsel for Chaney confirmed there was no need for a full hearing because agreements had been reached regarding the motions. Defense trial counsel then proceeded to put the agreements on the record, expressly stating that if [the prosecutor] objected to the proffer, he could clarify any issue.
When the defense's request for production of evidence inconsistent with guilt was reached, Chaney's trial counsel made the following statement:
"As to 22 is that any evidence known to the State which is inconsistent with the guilt of the defendant, when he said that there have been three witnesses who were potential alibi witnesses have been investigated, he gave me the name of Mrs. Cooper, Linda Murley, and Janey Hunter or Bobby Hunter's wife named Janey."
The trial court then responded as follows:
THE COURT: Is that all you know of?
[DEFENSE COUNSEL]: That's all the evidence that's inconsistent with the guilt.
[PROSECUTOR]: Right, uh-huh.
(RR Vol. 3 - 12).
[The prosecutor] never disclosed information to the defense about the search of Chaney's home and clothing. During the post-conviction investigation, [the prosecutor] confirmed this fact.
3. Undisclosed Impeachment Evidence Regarding Key Witness for the State.
*269 Less than a week after the crime, Curtis Hilton made an anonymous telephone call to DPD claiming Chaney called him earlier that day and talked about the murders. According to DPD investigative notes, the caller also said "Chaney is very capable of committing the murders and is really strung out on cocaine." At some point during that June 25, 1987 telephone conversation with Detective Westphalen, the caller identified himself as Curtis Hilton. Information provided by Hilton during this telephone call combined with Chaney's thumbprint lifted from the crime scene resulted in Chaney becoming the prime suspect in the investigation thus setting the stage for Hilton to become the State's key fact witness against Chaney.
During the course of the investigation, Hilton talked to both Detective Westphalen and the trial prosecution team on multiple occasions. He also testified numerous times before he testified in front of the jury which ultimately convicted Chaney. A review of the notes from interviews of Hilton, as well as transcripts of his court testimony reveal many significant inconsistencies. In fact, the trial court granted the defense motion for a mistrial based on Hilton's inconsistent testimony during the first jury trial that took place in November 1987.
During the November 1987 jury trial; pursuant to a pre-trial discovery agreement, the trial court allowed both sides to question Hilton outside the presence of the jury regarding admissibility of extraneous offense evidence and oral statements Chaney made to Hilton. During this process, Chaney's trial counsel made a record regarding the State's failure to disclose information regarding Hilton's prior statements (RR Vol. 4-221, 222, 242 & 243). [The prosecutor] also specifically stated at the end of his direct examination of Hilton, "I believe those are all of the oral statements" (RR Vol. 4-240). Despite that representation, Hilton then testified for the first time in front of the jury that he asked Chaney whether he cleared up his debt with John Sweek and Chaney said "yes" he had cleared up his debt (RR Vol. 4-266). The defense objected on the basis that Hilton had not included that information in his testimony offered in the Subrosa hearing (RR Vol. 4-267). The trial court sustained the objection, then directly asked the State whether there would be "any more surprises in statements." Then after hearing arguments from both sides, the trial court granted the defense motion for a mistrial (RR Vol. 4-272). Shortly thereafter, the trial court instructed the State to have Hilton testify again in order to have "a thorough hearing on all statements of the defendant" (RR Vol. 4-272). It is clear from the testimony that followed, and from Hilton's testimony in the second jury trial, that serious credibility issues existed in the midst of repeated arguments regarding whether Hilton's prior statements were disclosed to the defense.
Examples of impeachment evidence and prior inconsistent statements Hilton made that do not appear to have been disclosed to the defense include the following:
• Hilton told Detective Westphalen [that] Chaney discussed the murders with David Wall and Kevin Hollis.[55 ] David Wall told Detective Westphalen Chaney had never discussed the murders with him.
• Hilton told Detective Westphalen he got "bad dope" from John Sweek. An investigative note indicates that Detective *270 Westphalen determined this statement was not true.[56 ]
• Although Hilton repeatedly testified in front of the jury that Chaney said Hilton was his "alibi," it appears that Hilton previously told DPD and the DA's office that Chaney said Hilton was a witness to the last time Chaney had been at the Sweek apartment.
• Hilton told the DA's office Chaney said John and Sally Sweek had been robbed, tied and bound.
• In describing the last time he saw Chaney, Hilton said Chaney knocked on the door - he had just gotten out of jail and Hilton's wife was standing there with a shotgun.
• Hilton made numerous different statements regarding the debt Chaney owed John Sweek such as it was a $500 debt and it was a $900 debt. He also said he heard John Sweek talking to Chaney about the debt, John Sweek personally told Hilton about the debt and he read about the debt in John Sweek's ledger.
Please let me know if you have questions regarding this notice. Should any additional information come to light, this notice will be promptly supplemented.
a. Suppression and Favorability
1. Testing of the Shoes
The habeas court found that the State's trial evidence showed that the assailant's clothing and shoes would have been covered in blood, that Chaney's shoes could have left one of the two types of shoeprints at the scene, and that Chaney's shoes probably had blood on them. Nonetheless, Westphalen knew before he testified in front of the grand jury that an analysis of the shoes performed before Van Winkle's analysis, which was used at trial, showed that there was no blood on the shoes. Chaney later learned of the initial examination after reading newly discovered notes from Westphalen that he "talked to Dr. Stone. Debbie Spencer did the blood comparison on the spot on Chaney's tennis shoes. The spots are not blood." The habeas court found that the prosecutor did not disclose the existence of the note or prior testing because he never saw Westphalen's notes, and Westphalen never told the prosecutor about them. Defense counsel confirms that the evidence was not disclosed to him, and he further asserts that, had he known about the initial negative-result examination of the shoes, he would have used that evidence to impeach Van Winkle's testimony, and he would have called the first analyst to testify.[57]
Based on the foregoing, the habeas court concluded that the State suppressed evidence about the tennis shoes and that the evidence was favorable to Chaney. We agree. Although the prosecutor had no knowledge of Westphalen's notes, as the *271 investigating officer, Westphalen is included as "the State" for purposes of Chaney's Brady claim. Moreover, the evidence was favorable because it could have been used to impeach Van Winkle's testimony. Van Winkle was already unsure if the microscopic spots she found on Chaney's shoes were blood. Despite her uncertainty, she testified that the spots were probably blood. If Chaney had known that another crime-laboratory technician did not find any blood evidence on his shoes, that evidence would have allowed Chaney to impeach Van Winkle's testimony to the contrary. Chaney also could have called the forensic technician to testify about her examination that contradicted Van Winkle's findings.
2. House and Automobile Search
After Chaney was arrested, but before the pretrial hearing on October 19, Westphalen, the prosecutor, and an investigator searched Chaney's automobile and trailer on the Millsap property where he lived with his girlfriend. They were looking for evidence of blood to implicate Chaney based on their theory that the assailant-Chaney-should have been covered in blood given how John and Sally were murdered.[58] But they found none. According to the State's Brady notice, which the habeas court found credible, the search was not documented in the prosecutor's file or the DPD file. The prosecutor said in his affidavit that he did not disclose the search to the defense because he did not believe it was exculpatory.[59] The habeas court concluded that the evidence was favorable to Chaney and that the State suppressed it. We agree.
Similar to the undisclosed prior negative blood test on Chaney's shoes, the search of Chaney's trailer and automobile would have been useful impeachment evidence for Chaney since the authorities did not find blood even though the State's own witnesses testified that the assailant would likely have been covered in blood and that his shoes likely had blood on them.[60] We conclude that the State suppressed impeaching evidence about the unfruitful search of Chaney's trailer and automobile.
3. Hilton's Changing Statements
Shortly after the murders, Hilton called Westphalen, claiming that Chaney called him earlier that day to talk about the murders. According to Westphalen's investigative notes, Hilton told him that "Chaney is very capable of committing the murders and is really strung out on cocaine." Based on that evidence and the fact that the police found a partial left thumbprint from Chaney in the apartment, Chaney became Westphalen's main suspect.[61] As noted in the State's Brady notice, once Chaney became the prime suspect, Hilton became the State's key fact witness, supplying motives otherwise absent and supplying substantially more inculpatory evidence about Chaney's *272 claimed alibi.[62] According to the State, "Hilton's story to police and the prosecutor varied many times, but was presented to the jury as a consistent and credible story."
Throughout the investigation, Hilton spoke with Westphalen and prosecutors on multiple occasions. Newly discovered notes from the prosecutor show that Hilton not only gave inconsistent statements to Westphalen, but also he gave inconsistent statements to the prosecutor. Hilton testified three times before testifying at Chaney's second trial. Between investigative notes, interviews with Hilton, and Hilton's testimony at multiple hearings and trials, Hilton's statements to police clearly evolved over time in a way that made Chaney appear more guilty.[63] In fact, Chaney's first trial ended in a mistrial because of Hilton's changing statements. In its agreed supplemental findings of facts, the court found that,
Hilton testified at trial that [Chaney] told Hilton that Hilton was [Chaney]'s "alibi" to corroborate the time [Chaney] was last in the victim's apartment. However, Hilton originally told police that [Chaney] said Hilton was a "witness" to the last time he was at the Sweeks[ ] apartment, not an "alibi."
* * *
[Chaney]'s alleged use of the word "alibi" communicated to the jury that [Chaney] was conscious of his own guilt and had affirmatively taken steps to cover it up. The use of the word "witness" is far more neutral.
Thus, not only would [Chaney]'s counsel have been able to, as [defense counsel] states, "use the information to impeach Hilton's credibility," but the character of the prior inconsistent statement itself was materially different, and far less inculpatory, than that which was presented at trial.
The undisclosed statements also reveal that Hilton's testimony appears to have changed in order to harmonize with information State investigators learned about the crime and to incriminate [Chaney]. Hilton initially told police and the District Attorney's office that [Chaney] had said the victims had been robbed, tied, and bound. There is no other evidence to support these statements, and the State produced no such evidence at trial. Hilton never testified about these supposed statements, nor did the State elicit this inconsistency. By failing to disclose Hilton's statements that reflected an inaccurate understanding of the crime, the State artificially bolstered Hilton's credibility and made his testimony regarding [Chaney]'s "statements" more believable to a jury, since they appeared to be consistent with the State's theory.
The record supports the court's conclusions that the State suppressed the inconsistent statements of Hilton's and that those newly discovered statements are favorable to Chaney because he could have used them to impeach one of the State's most important witnesses. We adopt the findings and conclusions of the habeas court.
*273 b. Materiality
Suppressed evidence is material if the favorable evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence on the verdict." Kyles , 514 U.S. at 419, 115 S.Ct. 1555. The habeas court concluded that the suppressed evidence is material, and we adopt its conclusion.[64] According to it,
[Hilton]'s inconsistencies and untruths, taken together, change the character of Hilton as a witness. That is especially so when these violations are considered, as the Court must, in light of the other suppressed evidence, which weakened or eliminated the links between [Chaney] and the bloody crime scene. The suppressed material, taken collectively, seriously undermined the State's case against [Chaney]. Had the jury been presented with this evidence, and had [Chaney]'s counsel been able to utilize this information in his defense, there is more than a reasonable probability that the outcome would have been different.
Had the prior shoe examination and its results been disclosed to defense counsel, he could have called the laboratory technician to testify that she found no blood, in contradiction to Van Winkle's testimony, and defense counsel also could have impeached Westphalen's veracity. Even though he knew that another laboratory technician found no blood on Chaney's shoes, and even though he knew Van Winkle performed only a presumptive blood test and could not know if what she found was blood, Westphalen told the grand jury under oath that blood had been found on Chaney's shoes. The defense could have also used the State's unfruitful search of his property to further impeach the State's theory of the crime that the assailant would have been covered in blood because the police never found any blood. In addition to the suppressed blood evidence, had the defense known about Hilton's changing statements, it could have greatly impeached his testimony; testimony that the State heavily relied upon. For example, the habeas court found that, even though Hilton definitively testified at trial that Chaney owed John $500 when John was killed, he originally told police that Chaney owed John $900, and that figure kept changing. He told police contradictory accounts of how he learned of Chaney's debt. He claimed that he heard John and Chaney talking about it, but he later claimed that John personally told Hilton about it, and after that, he claimed that he read the amount in John's drug ledger. He also originally told police that Chaney told him he was his "witness" because the last time he was at John's apartment, Hilton was with him. But later, Hilton testified that Chaney called him his "alibi," implying a consciousness of guilt that he did not previously attribute to Chaney. Moreover, during his phone call with Westphalen, Hilton said that Chaney had spoken to David Wall and Kevin Hollis, acquaintances of Chaney, about the murders, but Wall told Westphalen that they had never talked about the murders. Hilton never made this claim during his testimony. He also told Westphalen that Chaney told him that John and Sally were bound and tied and robbed, but there was no evidence to support the claim. Finally, Hilton told Westphalen that he had bought cocaine from John before he died and that the dope was "bad." This implied that, even *274 though Hilton admitted to buying cocaine, he paid for the cocaine (and therefore did not owe John money like Chaney did), so he did not have the same motive he accused Chaney of having-a debt. But Westphalen later found out that Hilton lied to him and that John fronted the cocaine to Hilton (as he did to Chaney). In other words, Hilton owed money to John for cocaine that John gave to him shortly before John and Sally were killed. Further, not only did Hilton owe John money for cocaine when John and Sally were killed, but also he thought that the cocaine that he had yet to pay John for was "no good."
Chaney's newly discovered evidence affirmatively rebuts the State's theory at trial, but the importance of the newly discovered evidence is especially apparent in light of our earlier conclusions that testimony that Chaney bit John at the time of the murders is now known to be unreliable. The State's case was based on unreliable bitemark evidence, the testimony of a person who is now known to be a liar, the testimony of a laboratory technician that there was blood on Chaney's shoes, which has now been discredited by another expert, a partial left thumbprint in an apartment Chaney frequently visited, and statements Chaney made to Westphalen. In other words, the suppressed evidence, not only affected the defense's preparation and presentation of its case,[65] had the State disclosed the evidence, it almost certainly would have had to pursue another theory of guilt because the suppressed evidence crippled its theory. Taking all this into consideration, we conclude that the suppressed evidence is material because it undermines confidence in the jury's verdict, and there is a reasonable likelihood that, had it been disclosed, the suppressed evidence could have affected the judgment of the jury. Wearry v. Cain , --- U.S. ----, 136 S.Ct. 1002, 1006, 194 L.Ed.2d 78 (2016) (per curiam).
IX. ACTUAL INNOCENCE
Finally, we address Chaney's actual-innocence claim. An applicant can obtain relief on the basis that he is actually innocent of the crime for which he was convicted in light of newly discovered evidence. Ex parte Elizondo , 947 S.W.2d 202, 205 (Tex. Crim. App. 1996). When asserting such a claim, an applicant must prove by clear and convincing evidence that no reasonable juror would have convicted him based on the newly discovered evidence. Id. at 210. This is a Herculean burden. Ex parte Brown , 205 S.W.3d 538, 655-45 (Tex. Crim. App. 2006). Newly discovered evidence is that which "was not known to the applicant at the time of trial, plea, or post-trial motions and could not be known to him even with the exercise of due diligence." Miles , 359 S.W.3d at 671 (citing Brown , 205 S.W.3d at 545 ). An applicant may rely on a single piece or multiple pieces of new evidence so long as the burden of proof is met, and the newly discovered evidence must affirmatively support the applicant's innocence. Id. To determine whether an applicant has met that burden, the court must weigh the newly discovered evidence against the State's case at trial to determine the probable impact the evidence would have had at trial if the new evidence had been available. Elizondo , 947 S.W.2d at 206.
a. Newly Discovered Evidence
We agree with the parties' and the habeas court that even with the use of *275 due diligence, Chaney could not have discovered that (1) the body of science of bitemark comparisons would evolve in a way that discredited the evidence against him at his trial (e.g., new peer-reviewed studies, expert opinions based on those studies, updated ABFO manuals, etc.); (2) the State would suppress evidence that his shoes had been examined prior to Van Winkle's examination and that no blood was found; (3) no blood was found during a search of Chaney's property and vehicle; (4) Hilton gave numerous prior inconsistent statements; (5) Hales knowingly lied on the stand; (6) the State would conduct a post-conviction investigation, the result of which supports his actual innocence claim;[66] or (7) later DNA testing of all testable evidence excluded Chaney as a contributor or that unknown contributors would be found.[67]
b. Balancing of the Evidence
1. New Evidence
Significant newly discovered evidence supports Chaney's actual-innocence claim. For example, while not completely exonerating, new post-conviction DNA results of all the available crime-scene evidence excluded Chaney as a contributor from every item tested. At least three male DNA profiles were discovered on or under Sally's fingernails, but Chaney was not one of the contributors. Also, Chaney was excluded as the source of hairs found in Sally's right hand. The State's post-conviction investigation provides even more support. The State characterized its investigation as uncovering a "vast amount of evidence" to support Chaney's actual innocence claim. According to the State, several witnesses who were interviewed strengthened the original investigative theory that the victims were murdered in connection with their drug dealings and debts to individuals with ties to a cartel. Also, further investigation of Gonzalez led to information of two new suspects whom the habeas court found likely murdered John and Sally because of outstanding drug debts. None of these people, the State asserts, are connected to Chaney.
The State learned from a witness that Gonzalez probably dealt drugs for the Mexican Mafia and that his connection to it was a white man who worked jobs with him in Flower Mound, just outside of Dallas. It also learned that Gonzalez fronted drugs to a black man in Kaufman, also near Dallas.[68] That man drove a Cadillac or a Lincoln. The witness told the State that Gonzalez was fronted drugs, which he *276 in turn fronted to "the black man" and that, on one occasion, the lower-level drug dealer was arrested, and the drugs were seized. The witness opined that Gonzalez was desperate for money to pay off his drug debt, and he claimed that Gonzalez eventually left Texas for a while because his drug suppliers threatened to kill him. According to the witness, this was in the late 1980s, right around the time of the murders. During a second interview, he told police that he spoke to Gonzalez after he gave his first statement, and Gonzalez was furious with him. Gonzalez told him that he should not have told the police anything, especially about his drug debt or the black man who drove the Cadillac or Lincoln and sold Gonzalez's drugs in Dallas. The witness told police that he always believed that Gonzalez had something to do with the murders of John and Sally.
Police also spoke to another witness, who told them that Harry Lampkin, and his brother Elroy Lampkin, both black men, worked for the Mexican Mafia in June of 1987. According to the witness, Harry's and Elroy's connection to the Mexican Mafia was a white man, who owned a house in Kaufman, and Harry and Elroy worked for him. The witness claimed that the man was able to get Harry, Elroy, and another Lampkin family member to do anything. She also claimed that, around the time of the murders, there was a conflict between two of the men. The boss was furious that one of the men was "driving around in a car that he was supposed to get rid of or leave hidden in a shed on one of [his] properties." The witness also told the police that Elroy owned a Cadillac in June 1987, that Elroy lived in Terrell at the time of the murders, and that these men were violent and talked about killing people.
The State also spoke to one of Sally's colleagues, who worked with Sally up to the Friday before John and Sally were killed. She told the State that she had clear memories of Sally telling stories about her life and how she and her husband feared for their safety. Sally shared a number of stories with this witness, who did not believe them because they were too "Miami Vice." It was only after she discovered that Sally had been murdered that she realized Sally might have been telling the truth. Sally told the woman that John dealt drugs for the Mexican Mafia and that they were worried about their safety because they owed the cartel money. Sally also mentioned something to her colleague about John failing to make a drug delivery. According to this witness, Sally told her she and John wanted to get out of the drug dealing business and that, if something happened to her and John, John's brother would know about it because he was somehow involved.
2. Trial Evidence
At trial, the State positively identified Chaney as having bitten John at the time of the murders. It also established that Chaney's tennis shoes might have had two microscopic blood spots on them that were probably human blood, that it was possible that Chaney's shoes made the bloody shoeprints, that Chaney made inculpatory statements to Westphalen, that police found a thumbprint from Chaney's left hand, and that Chaney had the motive and opportunity to kill John and Sally.
According to the State at trial, the bitemark evidence was the most critical part of its case. The State specifically told the jury to convict on that evidence, and that evidence alone. That evidence, however, would now be inadmissible, including Hales's testimony that there was only a "[o]ne to a million" chance that someone other than Chaney bit John. Also, Hales now confesses that he has never been an *277 expert on the aging of wounds, but he now believes after reading scientific literature on the topic that his original opinion was correct that the wound was two to three days old at the time John was murdered. Hales also confesses that he has no idea why he changed his original opinion.[69] That is, the State can no longer prove that Chaney bit John or that John was bitten at the time of the murders. In fact, some of Chaney's experts argue that the injury might not even have been a bitemark. The remainder of the State's case has been virtually completely undermined by other newly discovered evidence. As the habeas court correctly noted, "without the bite mark evidence to definitively link [Chaney] to the murders, the jury would likely have viewed both the contradictory report on [Chaney]'s shoes and the lack of blood evidence found at his home more favorably."[70] The only remaining physical evidence that the State could rely upon was a partial left thumbprint found at the scene, which merely proves the undisputed fact that Chaney was in the apartment at some point, and bloody shoeprints that the State could not connect to Chaney. The last two pieces of the State's trial evidence were Chaney's statements to Westphalen, and Hilton's testimony about Chaney's possible motive to murder John and Sally. Chaney's statements to Westphalen made him look guilty in light of the State's trial evidence, but after considering the newly discovered evidence, those statements have virtually no inculpatory value. At trial, the statements appeared to support Hilton's testimony that Chaney was curious about Westphalen's visit because he was nervous about being caught for murdering John and Sally. But it is probable that, in light of the newly discovered evidence, a jury would have interpreted those comments as those of a person who was worried because he regularly bought cocaine from the two people who were murdered. With respect to Hilton, his explanations constantly changed and incrementally inculpated Chaney more each time they evolved. We agree with the habeas court that "the Brady material regarding Hilton's inconsistencies and untruths significantly erodes Hilton's testimony and, with it, any semblance of a motive for [Chaney] to have committed such a crime. Had the jury been exposed to Hilton's true lack of credibility through his inconsistent and untruthful statements, it would have had no reason to believe [Chaney] either had a guilty mind or a motive to commit the crime." *278 We also agree with the habeas court that Chaney's alibi takes on new importance and must be re-examined and viewed in a different light when added to the newly discovered evidence. Miles , 359 S.W.3d at 669 (discussing the heightened importance of Miles's alibi defense in light of newly discovered evidence). We agree with the habeas court that,
Most importantly, [Chaney] presented nine alibi witnesses at trial whose testimony was largely unimpeached. While a jury who heard that scientific evidence proved [Chaney] had, at a minimum, brutally assaulted John Sweek at the time of his murder was likely to find such witnesses incredible, [Chaney]'s alibi would have a completely different resonance today. Without the bite mark evidence to scientifically "prove" that [Chaney]'s alibi witnesses were lying, there is no longer any reason to discredit the strong case of innocence [Chaney] presented at trial.
X. CONCLUSION
Each piece of the State's trial evidence is questionable "or has since been undermined or completely invalidated." Miles , 359 S.W.3d at 673. When weighing Chaney's newly discovered evidence against the State's trial evidence, we conclude that Chaney has shown by clear and convincing evidence that "no reasonable juror would have convicted [him] in light of the new evidence." Ex parte Kussmaul , 548 S.W.3d 606, 636-37 (Tex. Crim. App. 2018) ; see Elizondo, 947 S.W.2d at 209. Chaney has proven that he is actually innocent. The judgment of conviction in cause number F87-95754-MK in the Fourth Criminal District Court of Dallas County is set aside, and Chaney is remanded to the custody of the Sheriff of Dallas County to answer the charges as set out in the indictment. Copies of this opinion shall be sent to the Texas Department of Criminal Justice-Correctional Institutions Division and Pardons and Paroles Division.
Keller, P.J., filed a concurring opinion. Alcala, J., filed a concurring opinion in which Hervey and Richardson, JJ., joined. Richardson, J., filed a concurring opinion in which Hervey, Alcala, and Newell, JJ., joined. Yeary, J., filed a concurring opinion. Newell, J., filed a concurring opinion in which Hervey, Alcala, and Richardson, JJ., joined. Keel, J., concurred.
Keller, P.J., filed a concurring opinion.
Should a convicted person be declared "actually innocent" merely because the State's case has completely fallen apart? Or should the evidence also affirmatively show that the defendant did not in fact commit the crime? I believe that the latter is the case, and that we should think carefully about what constitutes actual innocence in light of the evolution of actual-innocence from (1) a safety-valve claim for relief when relief would not otherwise be possible to (2) a claim that affords greater relief than other claims available to the convicted person.
When this Court first recognized a freestanding claim of actual innocence in Ex parte Elizondo , we framed the standard for obtaining relief in language reminiscent of a sufficiency review: whether the defendant has shown "by clear and convincing evidence that no reasonable juror would have convicted him in light of" newly discovered evidence.[1] In focusing the actual-innocence *279 standard on whether a reasonable juror would convict, we envisioned its application in a case in which the trial had been "error-free."[2] For an error-free trial, this standard could seem like a good fit for two reasons: First, there needed to be a way to grant relief when no other cognizable error could be shown. And second, if there was nothing wrong with the evidence at the trial and that evidence was originally sufficient to convince a reasonable juror that the defendant was guilty, new evidence would have to clearly demonstrate innocence in order for it to meet the standard. For example, new evidence from DNA testing might be used to challenge a sexual assault conviction that was based on the testimony of a victim who identified the defendant as the attacker. DNA evidence excluding the defendant from culpability would not directly attack the victim's identification testimony, but a reasonable juror would no longer believe the victim's otherwise credible testimony because the DNA evidence unquestionably shows that the defendant did not commit the crime.
Elizondo involved a different situation: a complaining witness recanting his claim that the defendant had committed a crime against him.[3] In that situation, however, Elizondo 's standard still seemed to fit. First, there was no other way to grant relief: It would be thirteen years before this Court would recognize the State's unknowing use of false testimony as a valid claim.[4] Second, a court would have to be clearly convinced that the recantation was true for it to preclude a reasonable juror from finding guilt,[5] and the recantation being true would mean that the defendant did not commit the crime.
In Ex parte Franklin , we recognized that Elizondo 's statement of the actual-innocence standard was not a complete statement of what was required to obtain relief: "Although not explicitly stated in the holding, it is clear that Elizondo requires that applicants presenting Herrera -type [freestanding innocence] claims offer evidence that goes towards affirmatively proving applicant's innocence. "[6] Franklin involved a recantation that did not directly bear on the defendant's guilt: The complaining witness recanted a statement that she had never had sexual relations with anyone other than the defendant.[7] As it turned out, she had. Her stepfather had been sexually abusing her.[8] Although this new evidence undermined the complainant's credibility, it "only collaterally affect[ed] her accusation against [the defendant]."[9] We held that the evidence was, therefore, not sufficient to establish actual innocence.[10]
At one time, actual innocence was the only claim that could be advanced when there was no misconduct by the State and there were no errors by defense counsel. But that has changed. Now, there are at *280 least two other avenues of relief: a claim involving new scientific evidence under Article 11.073[11] and a claim that the State unknowingly used false evidence.[12] As the present case illustrates, actual innocence is now often one of several claims advanced by an applicant on the basis of new evidence.[13] And actual innocence is now considered a claim for greater relief than these other claims because of the impact a declaration of actual innocence has on an applicant's reputation[14] and because such a declaration can also give rise to civil compensation.[15]
Judge Yeary has observed that a person who satisfies the Elizondo standard is not necessarily "innocent" because the literal statement of that standard just means that the current mix of evidence is such that a reasonable juror could not declare him guilty.[16] But actual innocence has always meant more than just a literal satisfaction of the Elizondo standard, which explains our more recent decision not to include as an actual-innocence situation a case in which a defendant is convicted under a statute that is facially unconstitutional.[17] In her concurring opinion in that case, Judge Alcala commented that the interrelationship between an actual-innocence declaration and civil compensation made it "necessary for this Court to apply the term 'actual innocence' strictly and consistently as a term of art."[18]
I think it is time to recognize that Elizondo 's formulation of the actual innocence standard was inadequate and to reformulate the standard to comport with what actual innocence really is. Instead of saying that "no reasonable juror would have convicted the applicant," we should say that an applicant must establish his innocence beyond a reasonable doubt. Of course, even when a defendant is unable to show innocence, he could still be entitled to relief. When new evidence falls short of showing innocence but wholly undermines the evidence supporting the conviction, an applicant could still seek relief under Article 11.073 or our false-evidence jurisprudence.[19]
In this case, Applicant's new evidence does not even meet Franklin 's requirement: it eviscerates the State's case against him but it does not affirmatively prove his innocence. He has alibi evidence, but it is not new. Even assuming that old alibi evidence could be so compelling that, when combined with new evidence undermining the State's case, a reasonable juror would necessarily conclude beyond a reasonable doubt that the defendant was innocent, that is not this case. Applicant's alibi evidence was from interested witnesses (mostly relatives), and it is possible for a reasonable juror to discount it. I also need not address whether innocence would be *281 established if an applicant's new evidence so undermined the State's case as to eliminate any evidence of any possible connection between the defendant and the crime. That is not the case here because the defendant had at least some connection to the victim, and in fact had a potential motive to kill: The victim was his drug supplier and Applicant owed him money. Because Applicant has not established his innocence beyond a reasonable doubt, I would not grant relief on his actual innocence claim. But because he has shown that he is entitled to relief under Article 11.073, I agree with the Court's decision to grant him a new trial.
I concur in the Court's judgment.
CONCURRING OPINION
Alcala, J., filed a concurring opinion in which Hervey and Richardson, JJ., joined.
I join the Court's majority opinion. I write separately to address whether it would be prudent to raise the burden of proof required of applicants seeking to establish actual-innocence claims from clear and convincing evidence to proof beyond a reasonable doubt. I conclude that this Court's current standard of clear and convincing evidence to establish actual innocence is proper and that it would be inappropriate to elevate that burden to something more onerous.
Although it has been suggested that the recent expansion of available avenues for habeas relief is a consideration that weighs in favor of elevating the burden of proof for actual-innocence claims to proof beyond a reasonable doubt, I am unaware of any legislative history supporting the view that the enactment of new grounds for habeas relief correlates to a need or intent to narrow the availability of habeas relief in actual-innocence cases by elevating the burden of proof for those cases.[1] And the proposal to elevate the burden of proof essentially revives what this Court already rejected as unworkable about twenty-five years ago. Before announcing the current standard, this Court effectively applied a beyond-a-reasonable-doubt standard imported from a sufficiency of the evidence analysis to resolve actual-innocence claims. In State ex. rel. Holmes v. Hon. Ct. of Appeals for Third Dist. , this Court stated,
[I]n order to be entitled to relief on a claim of factual innocence the applicant must show that based on newly discovered evidence and the entire record before the jury that convicted him, no rational trier of fact could find proof of guilt beyond a reasonable doubt.
885 S.W.2d 389, 399 (Tex. Crim. App. 1994). This standard made it virtually impossible for applicants to succeed on actual-innocence claims, and this Court later modified that standard in Ex parte Elizondo , 947 S.W.2d 202, 205 (Tex. Crim. App. 1996). Professors Dix and Schmolesky described the evolution of this standard as follows:
The criterion for determining whether relief is warranted under State ex. rel. Holmes v. Third Court of Appeals was obviously an extremely stringent one. It may have been so stringent as to be illusory.
In Ex parte Elizondo , the court acknowledged that the [ Holmes ] criterion would make relief impossible to obtain *282 and reconsidered the standard to be applied in these cases. Since these cases necessarily require the weighing of new evidence tending to show innocence against the evidence of guilt produced at trial, it reasoned, the approach to assessing "legal" sufficiency of the evidence is not appropriate for the task. Therefore, the court rejected the "implication" of [ Holmes ] that newly discovered evidence of innocence justifies relief only if it renders the State's case legally insufficient for conviction.[2]
Recognizing that the Holmes standard made relief effectively unattainable for allegations of factual innocence, this Court in Ex parte Elizondo devised the now-familiar standard applicable here: A habeas applicant is entitled to relief on a claim of actual innocence only if he proves by clear and convincing evidence that no rational jury hearing the new evidence as well as the evidence actually introduced at trial would return a verdict of guilty. See Elizondo , 947 S.W.2d at 205, 209.
Actual innocence already imposes a greater burden of proof-clear and convincing evidence-as compared to other habeas claims that have a preponderance of the evidence standard. Additionally, new evidence raising the prospect of actual innocence must offer some affirmative proof towards an applicant's innocence. Ex parte Franklin , 72 S.W.3d 671, 677 (Tex. Crim. App. 2002). Thus, while actual innocence may provide a greater form of relief in terms of restoration of reputation and monetary compensation than do other claims, establishing an actual-innocence claim already requires a more rigorous showing of entitlement to relief by clear and convincing evidence as compared to other habeas claims requiring proof by a preponderance of the evidence. In short, it is already difficult enough to establish a freestanding claim of actual innocence, and it is the unusual exception rather than the rule for this Court to grant that type of extraordinary relief. I, therefore, respectfully disagree that it would be appropriate to elevate the already "Herculean" burden of proof for actual-innocence claims.[3]
Furthermore, although I agree that the clear-and-convincing burden of proof is appropriate under this Court's current jurisprudence, I would further hold that, when an applicant, the State's elected district attorney, and the trial court all affirmatively represent in writing that an applicant meets the standard for actual innocence, as here, this Court should always adopt that recommendation, absent a suggestion of a gross misunderstanding of the applicable law or misconduct by the parties or judge. The parties are in the best position to evaluate the strength of the evidence used to convict the defendant and to assess the credibility and weight of the new evidence of innocence. This Court should reserve its evidentiary analysis for only those cases where the parties have an actual dispute about whether an applicant is entitled to relief on the basis of factual actual innocence.
My view that it is appropriate for this Court to abide by the agreement of the parties and the habeas court that an applicant is factually actually innocent is supported *283 by the statutory scheme describing compensation for an actually innocent person who is wrongfully convicted of offenses. A mechanism for resolving claims by agreement of the parties is already embodied in the statute for civil compensation for wrongful incarceration which, in addition to other situations, provides for compensation when two circumstances occur: (1) this Court grants habeas relief on any grounds, and then (2) the trial court dismisses the charge in accordance with the State's motion to dismiss that states that no credible evidence exists that inculpates the defendant and, either in the motion or in an affidavit, the State's attorney indicates his belief that the defendant is actually innocent of the crime for which he was sentenced.[4] TEX. CIV. PRAC. & REM. CODE § 103.001.
In the instant case, this Court grants actual-innocence relief due to clear and convincing evidence based on new facts, and applicant will be entitled to a money judgment under Section 103.001(a)(2)(B). See id. But even if this Court were to deny the actual-innocence claim and instead grant relief only on applicant's remaining claims, it appears to me that applicant would almost certainly be entitled to a finding of actual innocence and a money judgment under Section 103.001(a)(2)(C), as long as the State filed the appropriate paperwork described in the two steps above. Thus, with respect to civil compensation for wrongful incarceration, there is a discrepancy between the burdens of proof that apply when the State agrees that the defendant is innocent versus when it disagrees. When the State agrees with the applicant and files the required paperwork in the habeas court, the burden of proof to justify compensation on actual innocence under the civil statute is by a preponderance of the evidence because an applicant need only obtain habeas relief from this Court on any claim and he need not obtain an actual innocence finding from this Court.[5] But when the State does not agree with an applicant's claims on actual innocence, the burden of proof to establish actual innocence is by clear and convincing *284 evidence before an applicant may be found actually innocent by this Court and thereby entitled to a money judgment. Id. Because the civil statute permits a finding of actual innocence and financial compensation under circumstances in which any habeas claim has been shown by a preponderance of the evidence when the State and trial court agree that an applicant is actually innocent, I conclude that it would be improper to elevate this Court's standard of proof from a standard of clear and convincing evidence to a standard of beyond a reasonable doubt. The latter standard is too far removed from the preponderance of the evidence standard and it has already essentially been recognized as unworkable.
Here, the State agrees with applicant that he is actually innocent and the trial court adopts that agreement. Although I do not disagree with this Court's evidentiary analysis of the factual issues, I believe that this Court's analysis of applicant's actual-innocence claim is ultimately unnecessary to justify a civil finding of innocence and monetary compensation, given that this Court unanimously agrees that there are other grounds for habeas relief that would entitle applicant to relief, and given that the State and trial court agree that applicant is actually innocent. In short, the dispute amongst the members of this Court as to applicant's actual innocence, even if the concurring opinions were correct, will almost certainly be inconsequential to a civil determination that applicant is actually innocent and entitled to financial compensation under the applicable statute.
With these comments, I join this Court's majority opinion.
CONCURRING OPINION
Richardson, J., filed a concurring opinion in which Hervey, Alcala, and Newell, JJ., joined.
Presiding Judge Keller and Judge Yeary urge the Court to adopt a more rigorous test to prove that one is "actually innocent." I do not agree with their position. Rather, I join the majority opinion, which rightly follows the standard for actual innocence based on new evidence that we set out in Ex parte Elizondo -"[A]n applicant must prove by clear and convincing evidence that no reasonable juror would have convicted him based on the newly discovered evidence."[1] I see no reason to change the standard to now require Chaney to prove his innocence beyond a reasonable doubt. He did not have that burden at trial, and he should not have that burden now.[2]
Judge Yeary notes that he is "intrigued" by Presiding Judge Keller's position, but he is more than merely "intrigued." He advocates in this case, and has urged in prior cases,[3] that we should raise the burden *285 of proof on an actual innocence claim higher than the burden we set in Elizondo . In fact, Judge Yeary takes what I find to be the remarkable position that this Court might not even have the power to grant actual innocence relief, even though we have done so for years under clear precedent. Under Texas Civil Practice and Remedies Code, section 103.001, a person who has been imprisoned is entitled to compensation if the person "has been granted relief in accordance with a writ of habeas corpus that is based on a court finding or determination that the person is actually innocent of the crime for which the person was sentenced."[4] This Court is the only court with the power to grant such relief under Texas Code of Criminal Procedure articles 11.07 and 11.071. So I would ask, if we do not have the power to grant actual innocence relief, who does?
I cannot think of two more compelling cases where we have granted actual innocence relief than Ex parte Morton[5] and Ex parte Cacy.[6] In Ex parte Morton , new DNA evidence showed that another individual, not Morton, killed Morton's wife. This Court therefore granted relief on Morton's actual innocence claim. In Ex parte Cacy , there were not only significant Brady violations, but there was also new expert testimony and new scientific evidence conclusively showing that an accelerant was not used to start the fire that killed the victim. Yet, despite the overwhelming evidence supporting Cacy's actual innocence claim, Presiding Judge Keller and Judge Yeary still did not agree with the majority of this Court to grant Cacy actual innocence relief.[7]
In this case, Chaney presents the following new evidence to support his actual innocence claim:
• New scientific evidence to contradict the bitemark-comparison evidence relied on by the State at trial. The expert testimony bitemark evidence presented at trial in 1987, which was central to the State's case, would not be accurate nor admissible under today's scientific guidelines.
• False evidence. Expert testimony that there was only a "one to a million" chance that someone other than Chaney was the source of the bitemark was knowingly false at the time it was given. In addition, expert testimony that the bitemark wound occurred at the time of death was false and misleading.
• Evidence to show that the State violated Brady. The State failed to disclose that an earlier examination of Chaney's shoes uncovered no blood. The State failed to disclose the fact that the police searched Chaney's home and vehicle and found nothing. The State failed to disclose that Hilton (the anonymous caller pointing to Chaney as the killer) gave numerous inconsistent statements to police.
• New evidence to show that Chaney is actually innocent. In addition to the above, there was newly discovered evidence linking another person to the crime, and later DNA testing of all testable evidence excluded Chaney as a contributor.
*286 I agree with the majority that the State's case has been significantly undermined by the newly discovered evidence. And, I agree with the habeas court's observation that, "without the bite mark evidence to definitively link [Chaney] to the murders, the jury would likely have viewed both the contradictory report on [Chaney's] shoes and the lack of blood evidence found at his home more favorably." Moreover, I agree that the evidence presented by the State to prove Chaney's motive to kill has no inculpatory value in light of the new evidence, and Chaney's alibi evidence should now be viewed in a different light when added to the newly discovered evidence.[8]
Nevertheless, Presiding Judge Keller and Judge Yeary urge us to abandon the Elizondo standard and "reformulate the standard" to require an applicant to establish his innocence beyond a reasonable doubt. But if we apply that standard to this case, we would have to say that even though no reasonable juror would have convicted Chaney at trial in light of the new evidence-i.e., the Elizondo standard-he could not be granted actual innocence relief. That is too high a hurdle, particularly under the facts of this case. I agree with the majority that the Elizondo standard makes far more sense, which is why it should remain the standard, and which is why Chaney is entitled to actual innocence relief.
With these comments, I concur and join the majority.
CONCURRING OPINION
YEARY, J., filed a concurring opinion.
I.
I agree with the Court's conclusion that Applicant has established entitlement to relief on the basis of his claim that is predicated on Article 11.073. TEX. CODE CRIM. PROC. art. 11.073. Having so held, the Court today need not go on to address his false evidence claim or his Brady claim,[1] and I express no opinion with respect to those. I disagree that Applicant has satisfied Elizondo ,[2] and I would not also grant relief on that basis, even assuming that we must address that claim independently under Reyes . Ex parte Reyes , 474 S.W.3d 677, 681 (Tex. Crim. App. 2015).
Although I joined the Court's opinion in Reyes , I have since had second thoughts about the idea that a successful claim under Elizondo should be regarded as calling for "a greater form of relief." Id. As I made clear in my concurring opinion in Ex parte Cacy , 543 S.W.3d 802 (Tex. Crim. App. 2016) (Yeary, J., concurring), I do not regard the Elizondo standard as sufficiently rigorous to justify the nomenclature of "actual innocence." As Presiding Judge Keller suggests today, we may very well want to keep the door open to making habeas corpus relief available for any applicant who can satisfy the Elizondo standard. See Presiding Judge Keller's Concurring Opinion at 280 n.19. But I would not call that basis for relief "actual innocence," and I do not believe an applicant who satisfies that standard has necessarily *287 restored his "reputation," as Reyes assumed. 474 S.W.3d at 681. And, in any event, I have serious doubts that this Court is either constitutionally or statutorily empowered to grant relief in habeas corpus proceedings that is any more extensive than setting aside a judgment and remanding an applicant to face the underlying charging instrument. The restoration of an applicant's reputation and/or the propriety of granting monetary recompense are not determinations within the scope of our review.
I am intrigued by Presiding Judge Keller's suggestion that we should adjust the habeas applicant's burden of proof for so-called "actual innocence" claims-to make it even more rigorous. Presiding Judge Keller's Concurring Opinion at 280-81. I am open to a dialogue with my colleagues about that possibility in an appropriate case. An applicant who can show beyond a reasonable doubt that he did not commit the offense for which he was convicted would be far more justified in calling himself "actually innocent." See Cacy , 543 S.W.3d at 803 (Yeary, J., concurring) (satisfying the Elizondo standard "is not the same as establishing that the applicant is manifestly innocent "). In this case, however, I do not agree that Applicant has even established entitlement to relief under Elizondo , much less that he is "actually innocent" in any definitive sense. It is enough today that the Court grant him relief under his Article 11.073 claim, and be done with it.
Because the Court in this case ultimately grants no greater relief that it would in any event for a successful claim under Article 11.073-setting aside the judgment and remanding to the custody of the sheriff to answer anew to the charges-I concur in the result.
II.
Judge Richardson does not appear to understand my position. Here is the critical legal flashpoint in our debate that must be clearly understood: It is Criminal Law 101 that a determination by a jury that a person is "not guilty" does not amount to a declaration that he is "actually innocent" of the crime . The person may have actually committed the offense-factually, historically, and morally-but he cannot lawfully be convicted or punished by the State unless the State first proves his guilt to a level that will satisfy each juror beyond a reasonable doubt. We must not forget that principle.
I have said more than once that I have no problem with applicants obtaining relief from this Court from their judgments of conviction and sentence if they satisfy what has come to be known as the Elizondo standard. To satisfy that standard, an applicant must produce new evidence that satisfies this Court that, based on all known evidence, no reasonable juror would have found him guilty beyond a reasonable doubt. There is no doubt that, satisfying the Elizondo standard is a Herculean burden. And when an applicant satisfies it, he ought not to be required to continue living under the penalties imposed by his judgment of conviction.
But some members of this Court seem determined to declare to the world that all persons who satisfy only the Elizondo standard are also "actually innocent"! When a court declares an applicant to be "actually innocent," reasonable people will assume that the applicant so declared has satisfied at least some burden with regard to the question of his actual, factual, historical, and moral innocence. But, that may very well not be the case. The fact that a juror would not find a person guilty beyond a reasonable doubt-the functional test required to be met by Elizondo -is *288 not remotely the same thing as a demonstration of factual, historical, and moral innocence of a crime. Juries do not even declare defendants who have been acquitted after a trial to be "actually innocent." Instead, a jury is only permitted to declare that a defendant is legally "not guilty," which is another way of saying only that the State has failed to prove the person to be guilty beyond a reasonable doubt. A jury that acquits a defendant-and thereby calls him "not guilty"-might indeed have been convinced of his guilt by a preponderance of the evidence, or even to the level of clear and convincing evidence, but it would have still been required to find the person legally "not guilty" if it was not satisfied of the defendant's guilt to the level of beyond a reasonable doubt. And most people who have spent any time at all working in the criminal justice system know that there are times when defendants are found "not guilty" by a jury, but not a person in the room-including the jurors-really believes them to be "actually innocent."
The Elizondo standard does not literally require an applicant to establish that he did not commit the offense for which he was convicted by any standard whatsoever . Yet, we persist in declaring all applicants who satisfy only the Elizondo standard "actually innocent." In my view, we-judges on this Court-lack a humility appropriate to our true station when we declare to the public that an applicant is actually-and thus, factually, historically, and morally-innocent when-in factual, historical, and moral fact-he might very well not be. This is especially true when we have not required the applicants who seek such a declaration to establish their "innocence" by any legal burden that actually addresses that question.
I have also tried to be clear that this debate-whether and when to call an applicant "actually innocent"-has nothing to do with whether an applicant who has satisfied the burden established by Elizondo has earned a right to relief from his conviction. This Court has afforded relief from judgments imposing convictions for applicants who satisfy the Elizondo standard for years, and I have not advocated to abandon that practice. I am satisfied to provide Elizondo relief when applicants meet the standard established by that opinion. In fact, I have agreed with the Court to afford such relief before-several times, and even in Sonia Cacy's case.
It is evident to me, however, that some members of this Court relish being the arbiters of who is to receive monetary compensation and a lifetime of reduced-cost health care benefits after applicants have been wrongfully incarcerated. See Judge Richardson's Concurring Opinion at 284-85; Judge Alcala's Concurring Opinion at 282-84. Who would not want to be the bearer of great gifts to one so deserving as an actually innocent defendant who has been wrongfully convicted of a crime? And as much as those members might believe it to be so, I have no intent to meddle with the circumstances under which an applicant may be compensated, by tax dollars collected from the citizens of this State, for his wrongful conviction or incarceration. It is fine with me if applicants who satisfy Elizondo get paid and receive benefits-even if they have not established by any real legal burden their "actual innocence" of the crime for which they were convicted. But we cannot allow ourselves to be distracted by such purely civil matters when undertaking to decide whether to declare to the world that a person is "actually innocent" of a crime.
As far as I am concerned, the determination about who is entitled to compensation and benefits is none of my business as a Judge on the Court of Criminal Appeals, *289 and none of the rest of this Court's business either. In my view, that is quintessentially a civil question. It is a matter established by the Legislature, in the Texas Civil Practice and Remedies Code. Cases deciding whether people have met the standard established in that code are appropriately addressed, not to this Court, but to courts with civil jurisdiction and ultimately to the Texas Supreme Court.
Recognizing the boundaries of judicial power can be difficult. But it is a simple enough matter for me to conclude that the Court of Criminal Appeals is constitutionally disentitled to engage in the settling of civil disputes. We do not do that. We do not order people to be paid compensation, nor do we pay them compensation from the State's resources. Those kinds of issues are none of our business.
There have been cases where applicants have proven to this Court that they are "actually innocent." One example I can agree with is the case of Michael Morton, who had been wrongfully convicted of murder. I would call him "actually innocent" based on the evidence he brought to the attention of the Court that established pretty darn convincingly-perhaps even to the level of beyond a reasonable doubt-that he was not the killer. And this, then, touches upon the matter that I find intriguing about Presiding Judge Keller's opinion. I have not said that I am beyond the point of discussion on the question of what burden we ought to adopt for cases in which we declare a defendant "actually innocent." In fact, I said in my opinion in this very case that I am open to dialogue about it with my colleagues. But I would still feel less uncomfortable with calling applicants "actually innocent" in a forever-lasting, published opinion if they are required to meet at least some clearly established burden with regard to the actual question of "actual innocence" rather than to the question of "whether a juror would find guilt beyond a reasonable doubt."
My concern is that, if we set the bar too low, we will make a mistake and declare someone to be "actually innocent" who is not actually-and thus not factually, historically, or morally-innocent. If this Court does that, especially if we do it in a forever-lasting published opinion, then the Court's reputation will be tarnished in a similar way to the way in which it has been tarnished in the past when it has failed to provide relief to applicants who met the Elizondo standard. My concern is for the Court and for the enduring reliability of its determinations.
It is a tragedy when a person is convicted of a crime who should not be, and especially so if he is actually innocent. But the tragedy of a wrongful conviction is not the same as the conviction of an "actually innocent" person. The conviction of an "actually innocent" person is far more troubling and causes a far deeper wound to the integrity of our system. We should not persist in declaring applicants "actually innocent" who have merely demonstrated a wrongful conviction. It diminishes the importance of a declaration of "actual innocence."
This Court is the arbiter of its own "actual innocence" jurisprudence. We created it. We shepherd it. The Legislature has not codified it. Even the statute that affords compensation to wrongfully convicted persons does not compel this Court to declare anyone "actually innocent." Relief pursuant to that statute may be obtained whether or not this Court declares a person to be "actually innocent." See TEX. CIV. PRAC. & REM. CODE § 103.001 (a). The integrity of our own jurisprudence, then, ought to be our primary concern, and not whether we are pursuing good policy on the question of who deserves rewards for their wrongful convictions.
Newell, J., filed a concurring opinion in which Hervey, Alcala and Richardson, JJ., joined.
*290 The Court thoroughly explains the applicable standard for actual innocence relief and properly applies that standard to the facts of the case. As I cannot improve upon it, I simply join the Court's opinion. I write separately to address the concerns expressed regarding how we evaluate claims of actual innocence.
It is inaccurate to characterize the standard of review for actual innocence as a mere legal sufficiency review.[1] Simple deficiencies in the record regarding a single element of the offense suffice to meet that standard.[2] Actual innocence review, however, is triggered by newly discovered evidence-that which was not known to the defendant at the time of trial and could not have been known through the exercise of due diligence.[3] If an applicant can present such qualifying evidence, he must then show by clear and convincing evidence that despite the evidence of guilt-including a plea of guilt-no reasonable juror could have found the applicant guilty in light of this new evidence.[4] Moreover, the applicant must also show that he did not commit any greater or lesser-included offenses.[5] It is a Herculean task.[6] If it were an easy standard to meet, the Court would grant actual innocence relief more often.
So I do not see a reason to reformulate our current standard given how exacting that standard already is. Rather, I am concerned that heightening the existing standard could be perceived as an end-run around our sister court's interpretation of the term "actual innocence." The Texas Supreme Court has held that a wrongfully convicted defendant is entitled to compensation even under a Schlup -type claim of actual innocence.[7] This type of claim does not establish a claim for relief by itself, is proven under a lower standard than a substantive innocence claim, and is not entitled to the same degree of respect as a free-standing, or Herrera -type claim of actual innocence.[8] And yet, the Texas Supreme Court has held that this type of innocence claim merits compensation just *291 as a free-standing innocence claim does.[9] Elevating the standard for a free-standing innocence claim seems contrary to the path chosen by our sister court, and, as our sister court explains, our Legislature.[10]
Further, I disagree that the ability to grant habeas corpus relief on non-innocence claims under less exacting standards obviates the need for actual innocence review. As we have observed, a declaration of actual innocence provides greater relief than merely granting a new trial because it helps restore the defendant's reputation.[11] When the government has wrongfully convicted an innocent person, it is up to the government to make that person whole as best it can.[12] Actual innocence review provides a necessary safety valve to do just that. Raising the standard from exacting to impossible would only damage the efficacy and credibility of the criminal justice system as a whole. I see no reason to look for a solution to a problem that does not exist.
With these thoughts, I join the Court's opinion.

Tex. Code Crim. Proc. art. 11.073 (procedure related to certain scientific evidence when seeking post-conviction relief).

Ex parte Weinstein , 421 S.W.3d 656 (Tex. Crim. App. 2014).

Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Ex parte Elizondo , 947 S.W.2d 202 (Tex. Crim. App. 1996).

Chaney was tried twice. Initially, he was charged with murdering John and Sally, but after a mistrial was declared, the State proceeded on only the murder of John.

Rasnic explained why he and Nicole went back home even though they discovered the bloodied bodies of their two friends,
[RASNIC]: We went back to our place because we don't live but not even a mile from them. We went back and called [Nicole]'s brother Gary [Strange]. [Nicole] -- or John and Gary were best friends, they went to school together, they were closer than any of [Nicole]'s other brothers.
* * *
[RASNIC]: [S]he felt like it would be best to call [Gary] because he did know better than myself for sure.
[STATE]: What happened after you called Gary Strange?
[RASNIC]: We called Gary. Gary came over and he decided it would be best because I told him what we had seen and he decided it would be best if a member of the family was there just to verify and make sure. So he called Rick, John's brother.
* * *
[STATE]: And did Rick Sweek come over to where you were located?
[RASNIC]: Yes. We had -- told Rick that we would meet him at John and Sally's apartment. We went immediately over there and waited for him, for Rick.
* * *
[RASNIC]: We went up and called the police, called the fire department or rescue squad, whoever it was. They contacted the police. I knew that for sure. And Rick tried to call his father, Henry.
[STATE]: Okay. Where did you call the police from?
[RASNIC]: Up at the swimming pool. There's a telephone there, a pay phone.

The homicide investigator, John Westphalen, believed that two people were involved in the murders. However, there is no evidence that the police investigated that possibility. A post-conviction investigation by the State, which we discuss later, revealed that two associates of Juan Gonzalez, who were connected to the Mexican Mafia, likely murdered John and Sally.

According to the medical examiner, blood was smeared over John's entire body, including on the palms of his hands and on the soles of his feet. He also said that John's pants were soaked in blood on the back and on the right leg with a downward drip pattern on the front of the left, lower leg.

The police closed the door to keep the dog from contaminating the crime scene.

Westphalen testified at a pretrial hearing before the first trial that Gonzalez had called him on June 29, and Gonzalez initially denied that he knew John. He later admitted that he knew John from a prior job, and he claimed that he had bought drugs from John. However, he denied knowing where any of the Sweeks lived. Westphalen also testified that, when the two met a few days later, he noticed that Gonzalez was wearing heeled cowboy boots, which might have been similar to one of the sets of bloody shoeprints. Westphalen submitted Gonzalez's fingerprints for comparison, but there was no match. At that point, Westphalen effectively eliminated Gonzalez as a suspect, although he never explained why considering all of the other information he had about Gonzalez and the Mexican Mafia.

The caller eventually identified himself as Curtis Hilton.

During the call, Hilton initially told Westphalen that he was suspicious that Chaney might have robbed John because he "had been in need of money for a long time." Hilton said that, after the murders, Chaney suddenly had enough money to buy a car. But, at trial, Hilton told a different story. Hilton testified that Chaney was desperate for money, even after the murders, and he acknowledged that he himself owed Chaney $150 for cocaine and that Chaney demanded re-payment numerous times after the murders because he said that he needed the money.
Hilton also told police before trial that, when Chaney came to his house, his wife was with him when he answered the door, and she had a shotgun. At trial, however, Hilton said only that he refused to pay Chaney and told him not to contact him again. He did not mention his wife or a shotgun.

The judge told the State that,
[T]here's a world of difference between needing money to buy a car, to send money to my family, to get out of town, and "cleared up my debts." There's a world of difference. I cannot recall -- Maybe I fell asleep on the job, but surely I would have noticed that. Do you want me to check the court reporter's notes?
The State asked the court to review the record, and it showed that Hilton never testified about "clearing up" a debt at the pretrial hearing. As a result, the judge granted a mistrial.

According to counsel, the "clearing up the debt" testimony warranted a mistrial, and he told the court that,
That's right. When you have discovery ten days prior to trial and you fail to comply with discovery and then you piecemeal tell me things up until the time and I get misled all the way, I get misled as to Juan Gonzalez and evidence about that, yes.
* * *
Let me also say for the record that I was assured at the pretrial hearing by this Court that this prosecutor had always acted in good faith before and would continue to do so. And it has not been my experience in this situation and I had not been told the exact details of that. I have expressed to the Court during the sub rosa hearing exactly what I was told and we have obviously had problems in this situation since we had to have an in camera hearing of a file. And I'm not going to be accused of making any kind of mistake or asking for a preview of testimony at [a] discovery hearing because it's never been granted ever since I have ever practiced in Dallas County.

During that hearing, the court explained its exasperation with Westphalen and Hilton,
As regards the Gonzalez matter, the record will reflect that when this came up, the Court at the request of the defendant took an in camera hearing of both the State's files and the investigator's file; that all information turned over to the defendant was information that came from the investigator's file and was not contained within the State's file; that the defense asked for and received the remedy of a two-week continuance for purposes of that. So as regards that portion of your motion, the continuance in the Court's opinion would have cured that. Now, as regards the second portion of your motion, the Court is well aware of the testimony of this young man, having heard it three different times. The Court admonished him outside the presence of the jury to please say what the defendant had said ..., and each time he testified, we got different information. Therefore, I find that the testimony comes from independent acts of the witness who cannot seem to testify the same way twice, much less three times; that there was no gross negligence nor was any actual misconduct nor was this testimony the result of any acts of the State; that unfortunately the State's witness is the State's witness, and they are stuck with him.

Like Chaney, Hilton did not buy cocaine from John. Rather, John "fronted" it to Hilton, meaning that John gave Hilton the cocaine, but Hilton had to pay for the cocaine later.

In a new twist to Hilton's testimony, for the first time during the second trial, Hilton testified that Chaney had bought a car from an apprentice iron worker who worked at the same construction site as Chaney even though, in earlier statements and testimony, Hilton said that Chaney needed the money Hilton owed him so that he could buy a car.

At Chaney's second trial, and for the first time, Hilton testified that Chaney told him that he was his "alibi." Earlier, Hilton had said that Chaney told him that he was his "witness" because the last time he went to the Sweek apartment, he was with Hilton. The habeas court, as we will discuss later, found this distinction to be important. Hilton's new story, that Chaney told him that he was his "alibi," not his "witness," implied a consciousness of guilt that the word "witness" does not.

Hilton testified that he thought Chaney might have been involved in the murders because Chaney owed John money for drugs when he was killed. But when he spoke to Westphalen about two weeks after the murders, his story was different. At first, Hilton speculated that Chaney might have robbed John because, after the murders, Chaney had money, but he did not before the murders. Hilton later suggested that Chaney might have killed John because he was strung out on cocaine, and he owed John money.

In earlier statements and testimony, Hilton said that Chaney told him he wanted to go to Houston to visit his kids, but at Chaney's second trial, Hilton testified for the first time that Chaney said that he wanted to leave town until the murder investigation blew over because it was "too hot."

As we noted earlier, Hilton's testimony was different than his statement to Westphalen.

When asked, Hales could not remember the name of the article, only that it possibly appeared in a 1982 issue of the American Academy of Forensic Sciences Journal. The article he referred to was authored by Raymond Rawson, DDS, and was titled Statistical Evidence for the Individuality of the Human Dentition. Rawson, R., Ommen, R., Kinard, G., Johnson, J. and Yfantis, A., Statistical Evidence for the Individuality of the Human Dentition , 29 J. Forensic Sci. 1, 245-53 (1984). Despite Hales's reliance on the Rawson Study, he conceded on cross-examination that there is no worldwide database of bitemark characteristics and that bitemark comparisons suffer from a "lack of scientific core of basic data for comparison."

"Dentition" refers to the biting surface of the front teeth, i.e., the teeth that actually create the bitemark. It does not refer to identifying information from the entire mouth, which, in a typical adult, involves 32 teeth, and yields much more information. See Amicus Brief at 27 (citing Paul Gianelli, Edward J. Imwinkelried and Joseph L. Peterson, Reference Guide on Forensic Identification Expertise, Federal Judicial Center, Reference Manual on Scientific Evidence 104-06 (3d ed. 2011) ).

John and Sally were murdered on June 20, 1987.

Hunter testified that she called between 3:00 p.m. and 4:00 p.m., or even as late as 4:30 p.m.

To rebut the State's presumptive blood test evidence, the defense elicited testimony that spots on Chaney's shoes might have merely been rust from the pickup truck or animal blood from a cookout the night before.

The record contains no mention of Nina's last name.

Becky and Keith had never met Murley or Chaney and did not see them again until they testified at Chaney's murder trial. Becky testified that they received the call around 4:00 p.m. or 5:00 p.m. and that Keith and Chaney put the tire on at about 7:30 p.m. and then everyone left. Keith said that they returned with the replacement tire between 7:30 p.m. and 8:00 p.m.

As we explain later, the State conducted a post-conviction investigation after Chaney filed his writ application, and that investigation linked Gonzalez to the Mexican Mafia, John's likely drug supplier, and it showed that two associates of Gonzalez's, who were also connected to the Mexican Mafia, likely murdered John and Sally.

The trial court stated in it its initial findings of fact and conclusions of law that it "reserve[d] findings and recommendations on Grounds Three and Four." This was in part because the same day Chaney filed his original memorandum of law in support of his writ application, the State issued a Brady notice.

In Robbins , this Court decided that "scientific knowledge," for purposes of Article 11.073, includes a change in a testifying expert's scientific knowledge, not just a change in the body of science in that field. Robbins , 478 S.W.3d at 691. After our decision, the legislature codified our holding. Act of May 25, 2015, 84th Leg. R.S., ch. 1263, § 1, 2015 Tex. Gen. Law 4273, 4273 (amending Tex. Code Crim. Proc. art. 11.073(d) ). The bill analysis for that amendment states that the intent of the amendment was to clarify that Article 11.073 applies "not only to discredited science but also the testimony that was based on discredited science." House Comm. on Crim. Justice, Bill Analysis, Tex. H.B. 3724, 85th Leg., R.S. (2015).

Minor formatting changes have been made.

The American Board of Forensic Odontology (ABFO) offers board certification for forensic odontologists, and it provides training and issues guidelines to regulate the testimony of the odontologists that it certifies. ABFO Diplomates must adhere to the standards set forth in the ABFO Reference Manual.

In 2009, the National Academy of Science drafted a report that sought to examine the scientific bases underlying various forensic disciplines. The authors concluded that many of the scientific principles underlying forensic sciences used in the courtroom are unproven, or that experts have been overstating the probative value of their analyses of forensic evidence, including bitemark comparisons.

Authors of the amicus include Thomas Albright, Thomas L. Bohan, Barbara E. Bierer, Michael Bowers, Mary A. Bush, Peter J. Bush, Arturo Casadevall, Simon A. Cole, M. Bonner Denton, Shari Seidman Diamond, Rachel Dioso-Villa, Jules Epstein, David Faigman, Lisa Faigman, Stephen E. Fienberg, Brandon L. Garrett, Paul C. Giannelli, Henry T. Greely, Edward Imwinkelried, Allan Jamieson, Karen Kafadar, Jerome P. Kassirer, Jonathan "Jay" Koehler, David Korn, Jennifer Mnookin, Alan B. Morrison, Erin Murphy, Nizam Peerwani, Joseph L. Peterson, D. Michael Risinger, Michael J. Saks, George F. Sensabaugh, Jr., Clifford Spiegelman, Hal Stern, William C. Thompson, James L. Wayman, Sandy Zabell and Ross E. Zumwalt.

The State acknowledges that this Court in Spence v. State , 795 S.W.2d 743, 752 (Tex. Crim. App. 1990) (per curiam), held that "bite mark evidence has received sufficient general acceptance by recognized experts in the field of forensic odontology that it is unnecessary for us to consider the applicability of the Frye test to this cause," but it argues that Spence is distinguishable because it dealt with the qualifications of witnesses to testify as an expert, not whether the body of scientific knowledge underlying the field of bitemark comparisons had changed since Spence's trial.
We agree that Spence is distinguishable because the general reliability of bitemark-comparison evidence is not in dispute here. Compare Tex. R. Evid. 702, with Tex. Code Crim. Proc. art. 11.073 ; see Robbins , 478 S.W.3d at 691 (distinguishing a change of a method used in a field of science from a change in a witness's scientific knowledge); Coronado v. State , 384 S.W.3d 919, 926-27 (Tex. App.-Dallas 2012, no pet.) ("The existence of deficiencies in a particular field ... does not merit the wholesale exclusion of all evidence within that field."). Although we note that, according to Pretty, after examining the current state of bitemark comparisons, the Texas Forensic Science Commission recommended that "bite mark analysis no longer be admissible in Texas unless and until certain foundational research is done." Pretty Supp. Report at 2.

See, e.g. , Brzozowski et al. Affidavit at 6-10; Pretty Odontology Report at 2-3; Pretty Supplemental Odontology Report at 2-3; Bush Affidavit at 10; Hales Affidavit at 2-3; Amicus Brief (exhaustively detailing changes in the body of science of bitemark comparisons).

Under the ABFO standards in effect at the time of Chaney's trial, the ABFO used a scoring sheet for examiners, the purpose of which was to achieve uniform analyses of bitemarks by different examiners. Brzozowski et al. Affidavit at 7-8. Examiners could use the sheets to extrapolate bitemark-source probabilities. In 1988, shortly after Chaney's trial, the ABFO discontinued use of the scoring sheets due to "serious concerns over the potential of inappropriate statistical assertions ... as well as a lack of internal consistency." Id. at 8. Both Hales and Campbell used the scoring sheet, but only Hales's sheet was admitted at trial.

Although Campbell has since died, the new evidence also applies to his testimony because he testified that Chaney was the "biter" to a reasonable degree of dental certainty, but such testimony is no longer allowed under ABFO standards.

New developments in the body of science, for example, have not undermined bitemark comparisons to determine whether a person is excluded as the "biter," which is now the most definitive conclusion that can be drawn. American Bd. of Forensic Odontology, Inc., Diplomates Reference Manual: Section III: Standards & Guidelines at 102 (March 2016).

Pretty and Brzozowski et al., address the ABFO's revisions to the March 2016 Manual, explaining that the ABFO's revisions were largely in response to a study conducted by Pretty and Dr. Adam Freeman, in which they concluded that "certified ABFO Diplomates do not reliably agree about whether an injury is even a bite mark" and proceedings in front of the Texas Forensic Science Commission. Id. at 1-3 (citing Texas Forensic Science Comm'n (TFSC), Forensic Bitemark Comparison Complaint Filed by National Innocence Project on Behalf of Steven Mark Chaney (2016) ); Brzozowski, et al., Supp. Affidavit at 2-3. The authors of the Brzozowski supplemental affidavit also assert that other reasons for the revisions include the "the growing number of recent exonerations in criminal cases where bitemark testimony was declared improper" and "the lack of any current scientific studies to validate earlier ABFO Guidelines. The new Guidelines, as published in March 2016, prohibit individualization testimony in all cases." Brzozowski et al., Supp. Affidavit at 2.

Although we conclude that Chaney is entitled to relief based on a change in the underlying body of scientific knowledge of bitemark-comparison evidence, we nonetheless address his other claims because they are germane to his actual innocence claim.

Pretty Odontology Report at 5 (Hales's "testimony of a '[o]ne to a million' random match probability is also today accepted by the scientific community to be utterly without basis in science.").

Weiner's opinion about the aging of the wound on John's arm (as he said during his testimony) was based on Hales's opinion. Hales initially concluded that the wound was two to three days old at the time of the murders, but he later revised that opinion. After Hales revised his opinion, Weiner issued a supplemental autopsy report adopting that new conclusion. Thus, because Hales's testimony about the age of the wound has been discredited, so has Weiner's opinion. According to Baden,"[i]t was irresponsible, in my opinion, for Dr. Weiner to change his autopsy conclusion because [Hales] changed his opinion. It is the forensic pathologist who has the experience and training in evaluati[ng] the sequential changes that occur in a predictable time pattern during the healing process." Baden Affidavit at 3.

Some doctors thought that the mark was not a bitemark or was not definitively a human bitemark. See Baden Affidavit at 5; Brzozowski et al. Affidavit at 8-9; Pretty Report at 5. For example, Baden argued that the trauma could have been caused by a belt buckle or some similarly shaped object. Baden Affidavit at 5. The authors of the Brzozowski affidavit thought that "there is insufficient information to support the conclusion that the injury was a bite mark at all ...." Brzozowski et al. Affidavit at 9. Pretty concluded that the injury on John's forearm was not even "suggestive of a bitemark" under the ABFO Manual and that, if he were asked to testify about the injury to John's arm, he would testify that the injury is only a "potential source of salivary DNA." Pretty Report at 5-6 (citing Bush M.A., Bush P.J., Sheets, H.D., Statistical Evidence for the Similarity of the Human Dentition , 56 J. Forensic Sci. 1, 118-23 (2011) ). Baden also expressed great concern about Weiner's explanation for why he did not swab the injury for "blood groups in saliva that can be used to identify who the biter was ...." Baden Affidavit at 4. According to Baden, Weiner's excuse for not swabbing the wound because blood was present is a "totally improper excuse" because "[t]he blood groups in the victim's blood cannot change the blood groups present in the perpetrator's saliva or blood." Id. There was no testimony about whether John and Sally's dog could have bitten John before or around the time of the murders.

Chaney had reason to be concerned that police might think he was involved in the murders. He regularly bought cocaine from John at his apartment, and he and Hilton were over at the apartment not long before the murders. Chaney's statements to Westphalen, however, have considerably less probative value in light of the undermined bitemark evidence and based on other newly discovered evidence, which we later discuss in detail.

Hilton arguably had motive to implicate Chaney since he had also recently gone to the Sweeks's apartment and John fronted him some cocaine, which he had not yet paid for. He also told Westphalen later that the cocaine was "bad." So, when John was murdered, Hilton owed John money for cocaine that he thought was no good.

The hearing dealt with a juror who read an article about cocaine and whether her reading of that article affected the deliberations of the jury. During that hearing, the following exchange occurred,
[JUROR]: If you want to know what did it, what made my decision or not?
[DEFENSE]: Oh, okay.
[JUROR]: Do you want me to tell what made my decision? It had been done before the article. I was pretty certain about this (indicating) just about completely after all of that.
[DEFENSE]: Okay.
[COURT]: Let the record show that when she said, "I was pretty certain about this," she touched her forearm --
[JUROR]: The bite mark.
[COURT]: -- in the position of where the bite mark was described.

In a letter to Westphalen dated July 22, 1987, just over a month after the murders, Hales told Westphalen that "[t]he marks were not so definitely clear as to state that Chaney was the only person in the world that could have made those marks, but he definitely is included as the likely suspect as opposed to being excluded by reason of no matchup."

Hales said the following with respect to his revised opinion and the timing of it,
According to Dr. Weiner's autopsy bench notes, I informed him on June 30, 1987, that my opinion was that the bite mark occurred 2-3 days before death because of crusting, therefore, the person who inflicted the bite mark may or may not be the same person(s) causing the death. Then, on October 15, 1987, Dr. Weiner's autopsy bench notes reflect that I informed him I changed my opinion to "the bite mark occurred at or about the time of death." Below that note is an arrow pointing to another note where it appears Dr. Weiner quoted my explanation as to why my opinion had changed. The quotation specifically states: "based on amount of time between death and autopsy the crusting is interpreted as serum drying."
Although I do not recall the details of the various conversations I had regarding the case, I do recall that my opinion on the issue clearly changed shortly before the Chaney trial in October 1987.
Despite having reviewed numerous documents and photographs of the bite mark, I have no independent recollection of why my opinion regarding the age of the bite mark changed so significantly shortly before trial. My file reflects that I met with the prosecutor for one hour on October 14, 1987 and Dr. Weiner's bench notes reflect that I called him on October 15, 1987 to change my opinion regarding the age of the bite mark. My standard operating procedure for documenting a change in my medical opinion based on new information is to make a one-line cross-through the entry and date it with a new entry and write an explanation at an angle explaining myself to myself. I find nothing in my file to indicate I followed my standard operating procedure nor is there anything in my file to factually and/or medically support the change in my opinion.
As far as the "serum drying" explanation in Dr. Weiner's notes, I have no recollection of that being the reason why I changed my opinion nor do I currently see that as evidence to support the notion that the bite mark occurred at or near the time of death.
Hales Supp. Affidavit at 3. Baden agrees that the photographs show a wound that is two to three days old at the time that the photographs were taken. According to him, "[c]rust formation looks very different than dried serum." Baden Affidavit at 4.

We also note that Rasnic gave a statement as part of the State's post-conviction investigation, which supports this claim. In his statement, Rasnic says that,
During the trial[,] I was asked by the prosecutor if I had seen any type of bitemarks on John's arm. My response was[,"]No, I did not see any at that time." Although I am not 100% certain as to why I had said that, I believe I said that because of the information I had at that time [ ] was that John had multiple bite marks on his arm, so severe [that] they were to the bone.
Surely, I would have seen these marks if they were present. I was recently shown [ ] [a] photo of John's arm, which was the [first] time I had seen the injury on John's arm. The injury was nothing like what I had been told.
Now having seen the actual injury[,] I can't say if the injury was there or not or if I would have noticed it.

Hales now believes that the wound was two to three days old at the time of the murders, which comports with his and Weiner's original opinions before they were changed shortly before trial. Hales Supp. Affidavit at 3.

See Miles , 359 S.W.3d at 665-66 (withholding of police reports identifying other possible suspects constituted suppressed evidence favorable to the accused); Ex parte Mowbray , 943 S.W.2d 461, 466 (Tex. Crim. App. 1996) (withholding of a report from State's expert that supported the defendant's theory of the crime constituted suppressed evidence favorable to the accused); Cone v. Bell , 556 U.S. 449, 470, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009) (noting that each document suppressed by the State strengthened the State's case and could have been used to strengthen the defense's case).

This was the same day that Chaney filed his writ application, which is why the habeas court reserved the right to make additional findings and conclusions about Chaney's Brady and actual-innocence claims. On remand, those two issues were developed further.

David Wall and Kevin Hollis were acquainted with Chaney.

Hilton told Westphalen that he "bought" an eighth of an ounce of cocaine from John shortly before he was killed and that the dope was "bad." But later Westphalen added a note that Hilton lied about buying the cocaine. Instead, he discovered that, like Chaney, John "fronted" the eighth of an ounce of cocaine to Hilton shortly before John was murdered. Thus, at the time of John's murder, Hilton owed John money for cocaine that Hilton thought was "no good."

Defense counsel said that,
Given the importance of [the] blood evidence and the tennis shoes, I am confident I would have utilized the SWIFS examination results in my cross examination of both Westphalen and the serologist, Carolyn Van Winkle. Perhaps as significant; I would have attempted to call Dr. Stone and/or Debbie Spencer to testify on behalf of the defense.

According to the investigator, Westphalen told him that, because blood had been found on Chaney's tennis shoes, and given the nature of the bloody crime scene, they decided to search the property and Chaney's vehicle "for additional evidence of blood."

The prosecutor said that, "[a]fter Chaney's arrest, I attended a search at [his] home conducted by Det. Westphalen and another investigator. I did not disclose this search to [Chaney]'s counsel because I did not believe that it was exculpatory."

Defense counsel claimed that he would have used the evidence about the search and its results to "once again attack the prosecution's theory and corroborate my client's claim of innocence."

This was about the same time as Westphalen stopped pursuing Gonzalez as a suspect.

The State says that Hilton's testimony was "no doubt critical in the case against [Chaney]. Although not legally required, Hilton provided the jury with a motive for the crime as well as the inculpatory 'alibi' and crime scene statements [Chaney] allegedly made to Hilton." It also "acknowledges that [Chaney]'s ability to impeach this testimony was lost due to the State's failure to disclose the prior inconsistent statements of Hilton."

The State has exhaustively documented Hilton's changing statements in its Brady notice, which is quoted above.

The habeas court concluded that the suppressed shoe evidence and Hilton's changing statements were both material to Chaney's conviction in their own right. We do not address those conclusions, however, because we adopt the habeas court's conclusion that the suppressed evidence, when considered in its entirety, was material to Chaney's conviction.

In Thomas v. State , 841 S.W.2d 399, 405 (Tex. Crim. App. 1992), we explained that two considerations when assessing materiality are the impact that the suppressed evidence had on the defense's preparation or presentation of its case and how the suppressed evidence would have affected the overall strength of the State's case.

Although Gonzalez was identified in the original investigation, the State concedes that the corroborating evidence linking him to the crime is newly discovered evidence that was previously unavailable and could not have been discovered through the exercise of due diligence. We agree. However, we do not agree with the habeas court that all of the evidence in the State's sealed exhibits are new. For example, statements given to Westphalen by Sweek family members and others, which were disclosed to the defense after the judge held an in camera hearing, are not newly discovered.

We do not agree with the habeas court, however, that Chaney's "new" shoeprint evidence is newly discovered. The habeas court found that, defense counsel had labored under the misapprehension that Chaney bit John and that the State could prove that there was blood on Chaney's shoes, which limited possible defense strategies, including calling an independent shoe expert. Even though the defense was under the impression that the State could prove there was blood on his shoes, the evidence Chaney now offers through Matt Marvin-that his shoes probably did not make any of the bloody shoeprints-could have been developed at trial. Indeed, the defense tried to do just that.

Evidence in the record shows that the man the witness referred to is probably Elroy Lampkin.

Weiner originally determined before Hales that the injury on John's left forearm was two to three days old at the time of the murders based on evidence of healing that was present at the time of John's death. Hales initially agreed with that assessment, but soon after he met with the prosecutor, he changed his opinion and, subsequently, Weiner changed his too. Baden in his affidavit said that it was irresponsible for Weiner to change his testimony about the age of the wound because forensic pathologists, like Weiner, are more qualified to age a wound.
Hales's conclusion is also supported by a new statement from Rasnic that he was misled about the severity of the injury, which caused him to testify definitively that John did not have an injury on his left forearm when they went fishing a few days before the murder. He was told before trial that John had been bitten on the forearm "down to the bone." Now, however, he cannot say whether the injury was there or not, or after actually seeing pictures of the wound, whether he would have even noticed it.

As we noted earlier, in all likelihood, had the defense known about the prior examination of the shoes and the authorities' failure to find blood evidence at Chaney's residence or in his vehicle, the State would have had to pursue a different theory at trial. Its "bloody assailant" theory was already weak, consisting of only Van Winkle's testimony and testimony that Chaney's shoes could not be excluded as the source of some of the bloody shoeprints.

947 S.W.2d 202, 209 (Tex. Crim. App. 1996). Compare to Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ("whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") (emphasis removed).

See Elizondo , supra at 208.

See id. at 209-10.

See Ex parte Chabot , 300 S.W.3d 768 (Tex. Crim. App. 2009).

See Ex parte Brown , 205 S.W.3d 538, 547-48 (Tex. Crim. App. 2006) (recantation was not convincing enough to be found true to establish actual innocence).

72 S.W.3d 671, 677 (Tex. Crim. App. 2002) (emphasis added).

Id. at 673.

Id.

Id. at 678.

Id.

Tex. Code Crim. Proc. art. 11.073.

Chabot , 300 S.W.3d 768.

See supra at nn. 11-12.

Ex parte Reyes , 474 S.W.3d 677, 681 (Tex. Crim. App. 2015).

Ex parte Fournier , 473 S.W.3d 789, 797 (Tex. Crim. App. 2015) (Alcala, J., concurring).

Ex parte Cacy , 543 S.W.3d 802, 803 (Tex. Crim. App. 2016) (Yeary, J., concurring).

Fournier , 473 S.W.3d at 792-93.

Id.case-ids="6839235" index="95" url="https://cite.case.law/sw3d/473/789/#p797"> at 797 (Alcala, J., concurring).

In the unlikely event that new evidence eviscerates the State's case but cannot be raised under one of those two areas of the law, I would not foreclose the possibility that the applicant has nevertheless raised a cognizable claim for relief. We can address that unlikely scenario if and when it ever comes before us.

Other avenues of habeas relief now available include claims based on new science under Article 11.073 or on false evidence under this Court's decision in Ex parte Chabot . See Tex. Code Crim. Proc. art. 11.073 ; Ex parte Chabot , 300 S.W.3d 768 (Tex. Crim. App. 2009). But it does not follow that the expansion of other avenues for habeas relief means that the actual innocence ground for habeas relief should be returned to its prior status of a virtually unwinnable claim by imposing a beyond-a-reasonable-doubt burden of proof.

George E. Dix & John M. Schmolesky, 43B Tex. Prac. , Criminal Practice and Procedure § 59:34 (3d ed.).

See Ex parte Brown, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006) ("Establishing a bare claim of actual innocence is a Herculean task. We have stated that 'any person who has once been finally convicted in a fair trial should not be permitted to wage, and we do not permit him to wage, a collateral attack on that conviction without making an exceedingly persuasive case that he is actually innocent.' ") (quoting Ex parte Elizondo, 947 S.W.2d 202, 205 (Tex. Crim. App. 1996) ).

The relevant statute provides,
(a) A person is entitled to compensation if:
(1) the person has served in whole or in part a sentence in prison under the laws of this state; and
(2) the person:
(A) has received a full pardon on the basis of innocence for the crime for which the person was sentenced;
(B) has been granted relief in accordance with a writ of habeas corpus that is based on a court finding or determination that the person is actually innocent of the crime for which the person was sentenced; or
(C) has been granted relief in accordance with a writ of habeas corpus and:
(i) the state district court in which the charge against the person was pending has entered an order dismissing the charge; and
(ii) the district court's dismissal order is based on a motion to dismiss in which the state's attorney states that no credible evidence exists that inculpates the defendant and, either in the motion or in an affidavit, the state's attorney states that the state's attorney believes that the defendant is actually innocent of the crime for which the person was sentenced.
Tex. Civ. Prac. & Rem. Code § 103.001.

I note that this is what happened with Hannah Overton following her wrongful conviction and incarceration for the 2006 death of her foster son. This Court denied her actual-innocence claim but granted her relief on the basis of ineffective assistance of counsel. Ex parte Overton , 444 S.W.3d 632, 633 (Tex. Crim. App. 2014). After that, based on the dismissal of her charges and the district attorney's agreement that she was actually innocent, she was awarded almost $600,000 in compensation. See Lauren Effron and Juju Chang, Mom convicted in salt poisoning death to get nearly $600K for wrongful incarceration , ABC News (Mar. 7, 2018, 11:08AM ET), available at https://abcnews.go.com/US/texas-mother-murder-conviction-overturned-receive-500k-state/story?id=53578422.

Majority Opinion at 271-72 (citing Ex parte Elizondo , 947 S.W.2d 202, 205 (Tex. Crim. App. 1996).

I am aware that the Supreme Court has held that the presumption of innocence "disappears" after an applicant "has been afforded a fair trial and convicted of the offense for which he was charged." Herrera v. Collins , 506 U.S. 390, 399, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). However, that rule of law seems to beg the question when we are dealing with an actual innocence claim based on false evidence. If the State's evidence presented against a defendant was faulty in any way, whether because it was untrue, or secured improperly, or misleading because exculpatory evidence was withheld, then how can we say the defendant was "afforded a fair trial?"

See Ex parte Cacy , 543 S.W.3d 802 (Tex. Crim. App. 2016) (Yeary, J., concurring); Ex parte Wimberly , No. WR-64,017-05, 2017 WL 4946546 (Tex. Crim. App. November 1, 2017) (Yeary, J., concurring).

Tex. Civ. Prac. & Rem. Code § 103.001.

No. AP-76, 2011 WL 4827841 (Tex. Crim. App. Oct. 12, 2011).

No. WR-85,420-01, 2016 WL 6525721 (Tex. Crim. App. Nov. 2, 2016).

Ex parte Cacy , 543 S.W.3d 802 (Tex. Crim. App. 2016) (Yeary, J., concurring, joined by Presiding Judge Keller).

See Ex parte Miles , 359 S.W.3d 647, 673 (Tex. Crim. App. 2012) (holding that, "[w]hen we balance the newly available evidence ... with other exculpatory evidence and the evidence of guilt presented at trial, we are satisfied that Applicant has shown by clear and convincing evidence that no rational jury would convict him in light of the new evidence").

Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Ex parte Elizondo , 947 S.W.2d 202 (Tex. Crim. App. 1996).

See Ex parte Tuley , 109 S.W.3d 388, 392 (Tex. Crim. App. 2002) ("An applicant claiming actual innocence is not claiming that the evidence at trial was insufficient to support the conviction."); see also Ex parte Mayhugh , 512 S.W.3d 285, 298 (Tex. Crim. App. 2016) (plurality op.) (noting that no one could ever be found actually innocent on habeas review if the original trial evidence was legally sufficient to support guilt).

See, e.g., Britain v. State , 412 S.W.3d 518, 520 (Tex. Crim. App 2013) (noting that under the legal sufficiency standard, "evidence may be legally insufficient when the record contains either no evidence of an essential element, merely a modicum of evidence of one element, or if it conclusively establishes a reasonable doubt") (citing Jackson v. Virginia , 443 U.S. 307, 320, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ).

Ex parte Brown , 205 S.W.3d 538, 545 (Tex. Crim. App. 2006) (noting that a habeas applicant must not only make a truly persuasive showing of innocence, he must also prove that the evidence he relies upon is "newly discovered").

Tuley , 109 S.W.3d at 390-91 (noting that a guilty plea does not foreclose actual innocence relief).

Ex parte Kussmaul , 548 S.W.3d 606, 641 (Tex. Crim. App. 2018) (holding that the term "actual innocence" applies only in circumstances in which an accused did not commit the charged offense or any greater or lesser offenses).

Brown , 205 S.W.3d at 545.

In re Allen , 366 S.W.3d 696, 710 (Tex. 2012).

Id. at 704-05.

Id. at 710.

Id. at 707 (concluding that the Legislature intended that the legal term of art, "actual innocence," includes both free-standing innocence claims and innocence claims based upon Schlup v. Delo , 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) ).

Ex parte Reyes , 474 S.W.3d 677, 681 (Tex. Crim. App. 2015).

The Code of Criminal Procedure places a duty upon prosecutors, not to convict, but to see that justice is done. Tex. Code Crim. Proc. , art. 2.01. That duty does not end upon conviction. The transparent and thorough way in which the prosecutors have handled Applicant's claims perfectly illustrates this point.